FILED
United States Court of Appeals
Tenth Circuit

July 28, 2015

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

        Plaintiff - Appellant/Cross-
        Appellee,

      v.

ANGEL DILLARD,

        Defendant - Appellee/Cross-
        Appellant.

Nos. 13-3253 & 13-3266

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 6:11-CV-01098-JTM)**

Thomas E. Chandler, Attorney, Department of Justice, Civil Rights Division, Appellate Section (Jocelyn Samuels, Acting Assistant Attorney General; Diana K. Flynn and Dennis J. Dimsey, Attorneys, Department of Justice, Civil Rights Division, Appellate Section, with him on the briefs), Washington, D.C., for Plaintiff–Appellant/Cross-Appellee.

Theresa Lynn Sidebotham of Telios Law, PLLC, Monument, Colorado (Donald A. McKinney of McKinney Law Firm, Wichita, Kansas, with her on the briefs), for Defendant–Appellee/Cross-Appellant.

Before **McHUGH, McKAY,** and **BALDOCK,** Circuit Judges.

**McKAY**, Circuit Judge.

These cross-appeals arise out of a civil enforcement action brought by the United States under the Freedom of Access to Clinic Entrances Act of 1994 (FACE), 18 U.S.C. § 248, which prohibits using force, threats of force, or physical obstruction to injure, intimidate, or interfere with those seeking to obtain or provide reproductive health care services. The government alleges Defendant Angel Dillard violated FACE by sending a threatening letter to a doctor whose plans to open an abortion clinic in Wichita, Kansas, had recently been made public.

The district court denied Defendant's motion to dismiss but subsequently granted her motion for summary judgment, concluding that Defendant's letter did not contain a true threat because (1) it did not suggest unconditional, imminent, and likely violence and (2) it predicted violence by third parties but did not suggest Defendant would herself engage in violence against the doctor. The government appealed the district court's grant of summary judgment. Defendant then cross-appealed, arguing the district court should have granted her earlier motion to dismiss both because the government lacked standing to bring this action against her and because FACE is unconstitutional both facially and as applied.

**I.**

In late 2010, Dr. Mila Means, a family practitioner in Wichita, confirmed public reports that she intended to begin offering abortion services to the public. At that time, no doctors were performing abortions in Wichita. The last doctor to do so, Dr. George Tiller, had been shot to death in 2009 by an anti-abortion activist named Scott Roeder

-2-

while attending church services. Dr. Tiller had been "a mentor and a very admired colleague" of Dr. Means for several years before his death. (Appellant's App. at 142.)

On January 14, 2011, federal law enforcement officers held a meeting at Dr. Means' office "to brief her and her staff on security measures regarding abortion extremism." (Appellant's Sealed App. at 265.) Among other things, they "talked about the Summer of Mercy, the fire bombing of [Dr.] Tiller's clinic . . . , the fact that [Dr.] Tiller had been shot by Shelley Shannon in both arms, that [vandals had flooded Dr. Tiller's clinic by inserting a garden hose through a hole they cut in the roof], and ultimately the murder of [Dr.] Tiller at church." (*Id.*) They also discussed dealing with bomb threats and watching for suspicious packages.

On about January 15, 2011, Defendant Angel Dillard wrote a letter to Dr. Means and mailed it to her office in an envelope bearing Defendant's name and return address. This letter states in full:

> Dr. Means,
>
> It has come to our attention that you are planning to do abortions at your Harry St. location. I am stunned that you would take your career in this direction. Fewer people than ever before are pro-abortion, quality physicians wouldn't even consider associating themselves with it, and more Americans than ever before are unwilling to turn a blind eye to the killing of a baby when the ratio of adoption is 36 couples to 1 baby.
>
> Maybe you don't realize the consequences of killing the innocent. If Tiller could speak from hell, he would tell you what a soulless existence you are purposefully considering, all in the name of greed. Thousands of people are already looking into your background, not just in Wichita, but from all over the U.S. They will know your habits and routines. They know where you shop, who your friends are, where you drive, where you

live. You will be checking under your car everyday—because maybe today is the day someone places an explosive under it. People will be picketing your home, your office. You will come under greater scrutiny than you've ever known, legally and professionally. Much worse than the disciplinary actions and ethical concerns that you've been facing. You will become a pariah—no physician will want to associate with you. You will be seen like all the other hacks that have stooped to doing abortions when they weren't good enough to maintain a real practice. You will lose your legitimate clientele, as no one bringing a baby into this world wants to be in the same facility where you are also killing them. You will have trouble keeping staff who are willing to participate in innocent blood-shedding and won't be able to keep the sanitary conditions necessary to maintain a healthy medical facility. You will end up having the same kind of rat-infested, dirty facility that they have in north-eastern Kansas. Anyone who partners with you will experience the same headaches. Not to mention the fact that you will be haunted by bloody, squirming, dismembered babies in your sleep. You can't do what is morally reprehensible and enjoy peace of mind. The Bible says, "There are six things the Lord hates . . . hands that shed innocent blood, a heart that devises evil schemes, feet that are quick to rush into evil . . ." Proverbs 6:16-18. Abortion kills human life—it matters not if you kill it at 6 weeks or at 26 weeks, it's still the unnatural, violent death of a human baby for the sake of convenience. You are doing what the Humane Society wouldn't allow to happen to a pregnant dog or cat.

I urge you to think very carefully about the choices you are making. There are 3 churches within 1 block of your practice, and many others who must take a stand. We will not let this abomination continue without doing everything we can to stop it. We pray you will either make the right choice and use your medical practice to heal instead of kill, or that God will bring judgment on you, the likes of which you cannot imagine. We don't want you killing our children in our community. Good people are tired of this rampant evil, and will stand against you every step of the way. Do the world a favor and ABORT this stupid plan of yours. It's not too late to change your mind.

Angel Dillard

(Appellant's App. at 25.)

Dr. Means' office manager received the letter on January 19, 2011, and immediately notified the Wichita police. The office manager and a local police officer

-4-

showed the letter to Dr. Means. (*Id.* at 148.) A copy of the letter was also forwarded to the FBI, and thereafter an FBI agent interviewed Defendant. The FBI did not take any of the follow-up actions they would have taken had they determined Defendant to be a threat. (*See* Appellant's Sealed App. at 180.)

Shortly after receiving the letter, Dr. Means' staff found an Associated Press article on the internet which discussed Defendant's friendship with Scott Roeder, Dr. Tiller's murderer. This article apparently reported that Defendant had befriended Mr. Roeder while he was in jail for the murder.[1] The article indicated that Defendant admired Mr. Roeder for following his convictions and being "the only one able to stop abortions in Wichita." (Appellant's App. at 153.) The article further reported that Defendant "said she had been questioned several times by the FBI, and she and her husband have no plans to do anything of violence to anyone." (*Id.* at 153-54.)

Reading this news article did nothing to allay Dr. Means' concerns. She believed that Defendant's admiration of Mr. Roeder suggested a likelihood that she too would go "from protester to murderer," and she remained very anxious that Defendant or her associates would indeed place an explosive under her car as suggested by the letter. (*Id.* at 154.) Dr. Means accordingly began taking additional security precautions, such as

---

[1] Other evidence in the record indicates that Defendant was a minister at the local jail and became acquainted with Mr. Roeder in this capacity. However, it is not clear that this information appeared in the news article. Neither party included a copy of the news article in the record on appeal, so our description of this article is based mainly on Dr. Means' testimony regarding the article's contents.

parking her car in sight of her office, taking her car to the mechanic, and installing door alarms.

In April 2011, the government brought this civil enforcement action against Defendant, seeking fines as well preliminary and permanent injunctive relief. After a hearing, the district court denied the government's request for a preliminary injunction. Defendant then filed a motion to dismiss in which she argued the government lacked standing to bring this action and could not show a violation of FACE because the statute only covers current abortion providers and Dr. Means was not providing abortions at the time the letter was written. The district court denied the motion to dismiss, holding that "the statute is properly read to apply to true threats directed at discouraging physicians from completing training for the provision of abortion services." (*Id.* at 338.)

While discovery was ongoing, Dr. Means abandoned her plans to open an abortion clinic due to recent changes in Kansas law. As a result, the protest activities against her dropped off.

After the parties completed discovery, Defendant filed a motion for summary judgment. She argued that no reasonable person could view her letter as a threat because it did not threaten imminent violence or convey a likelihood of execution, and she argued any finding of a violation would therefore violate the First Amendment. Defendant also argued that summary judgment was warranted because the government had presented "no direct evidence to show . . . that she subjectively intended the letter to be a threat of force." (Appellant's Sealed App. at 101.)

-6-

The district court agreed that the letter did not convey a true threat because (1) the alleged threat of a car bomb was not "imminent, likely and unconditional"; and (2) "the letter says nothing about what [Defendant] will do, only what other entities might do." (Appellant's App. at 365-66.) The court granted summary judgment to Defendant on this ground, and accordingly did not resolve Defendant's alternative argument that the government had failed to show a subjective intent to threaten.

The government appeals the district court's summary judgment decision, and Defendant cross-appeals the district court's denial of her earlier motion to dismiss. The parties have also filed documents discussing whether the parties' briefs and portions of the appellate appendix should be sealed. We will address the government's appeal first, then Defendant's cross-appeal, and finally matters relating to the sealing of the briefs and appendix.

**II.**

We review the district court's summary judgment ruling de novo, applying the same legal standards as the district court. *Doe v. City of Albuquerque*, 667 F.3d 1111, 1122 (10th Cir. 2012). "Summary judgment should be granted if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Id.* (internal quotation marks omitted).

Under FACE, an individual may be subject to fines or other penalties if he or she

"by force or threat of force . . . intentionally injures, intimidates, or interferes with . . . any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services." 18 U.S.C. § 248(a)(1). The statute defines "intimidate" to mean "to place a person in reasonable apprehension of bodily harm to him- or herself or to another." *Id.* § 248(e)(3). The statute specifically provides that it shall not be construed "to prohibit any expressive conduct . . . protected from legal prohibition by the First Amendment to the Constitution." *Id.* § 248(d)(1).

FACE does not define the phrase "threat of force." However, since FACE must be interpreted consistently with the First Amendment, we agree with the Ninth Circuit and with the district court below that this term should be interpreted consistently with well-settled law defining "true threats" which fall outside of the First Amendment's protections. *See Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1077 (9th Cir. 2002) (en banc). Thus, if Defendant's letter can be construed to contain a true threat for First Amendment purposes, it will also be construed to contain a "threat of force" in violation of FACE.

The Supreme Court has defined "true threats" to be "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003). To fall outside of the First Amendment's protections, a threat must "'according to its language and context convey[] a gravity of purpose and likelihood of

-8-

execution so as to constitute speech beyond the pale of protected vehement, caustic, unpleasantly sharp attacks on government and public officials.'" *United States v. Crews*, 781 F.2d 826, 832 (10th Cir. 1986) (internal quotation marks, brackets, and ellipses omitted) (quoting *United States v. Kelner*, 534 F.2d 1020, 1026 (2d Cir. 1975)). While a true threat must include "a serious expression of an intent to commit an act of unlawful violence," *Black*, 538 U.S. at 359, the speaker need not intend to actually act upon the threat. As we have explained:

> It is not necessary to show that defendant intended to carry out the threat, nor is it necessary to prove he had the apparent ability to carry out the threat. *The question is whether those who hear or read the threat reasonably consider that an actual threat has been made.* It is the making of the threat and not the intention to carry out the threat that violates the law.

*United States v. Viefhaus*, 168 F.3d 392, 395-96 (10th Cir. 1999).

We apply an objective test to determine whether the speaker made a true threat, "focusing on whether a reasonable person would find that a threat existed." *United States v. Magleby*, 241 F.3d 1306, 1311 (10th Cir. 2001). This objective test requires "a fact-intensive inquiry, in which the language, the context in which the statements are made, as well as the recipients' responses are all relevant." *Nielander v. Bd. of Cnty. Comm'rs of Cnty. of Republic, Kan.*, 582 F.3d 1155, 1167-68 (10th Cir. 2009).

Because this test involves a fact-intensive inquiry, we have consistently held that "whether a defendant's statement is a true threat or mere political speech is a question for the jury." *Viefhaus*, 168 F.3d at 397. "If there is no question that a defendant's speech is

protected by the First Amendment, the court may dismiss the charge as a matter of law." *Id.* "But, absent an unusual set of facts, the question whether statements amount to true threats is a question generally best left to a jury." *United States v. Wheeler*, 776 F.3d 736, 742 (10th Cir. 2015) (internal quotation marks omitted).

The district court held that Defendant's letter did not contain a true threat because (1) it did not convey an unconditional, imminent, and likely threat of violence, and (2) it did not suggest that Defendant herself would engage in violence against Dr. Means. We first address the district court's conclusion that a true threat must convey an unconditional and imminent threat of violence, then turn to the district court's holding that the letter did not suggest violence by Defendant herself, and finally consider de novo whether a jury could reasonably find a true threat under all of the circumstances of this case.

The district court concluded that Defendant's letter did not contain a true threat because it was conditional, suggesting a bomb might be placed under her car only if she did not reconsider her plans to offer abortion services. However, our cases make clear that a statement may constitute a true threat even if it is conditional. In *Crews*, we upheld a conviction based on the statement that "[i]f Reagan came to Sheridan, I would shoot him,'" 781 F.2d at 829, expressly rejecting the defendant's argument "that his statement was not a 'true threat' because it was contingent on President Reagan coming to Sheridan, Wyoming." *Id.* at 832 n.3. Indeed, when a threat is used to intimidate or dissuade an individual from taking a particular action, the threat will often be contingent, with the threatener suggesting that violence will only be used if the listener fails to comply with

-10-

the threatener's demands. Such a contingent threat may still violate FACE. As the Seventh Circuit has explained, "Most threats are conditional; they are designed to accomplish something; the threatener hopes that they *will* accomplish it, so that he won't have to carry out the threats. They are threats nonetheless." *United States v. Schneider*, 910 F.2d 1569, 1570 (7th Cir. 1990). The district court thus erred in holding that Defendant's letter did not contain a true threat because it suggested violence only if Dr. Means followed through with her plans to offer abortion services in Wichita.

We likewise reject the district court's conclusion that Defendant's letter did not contain a true threat because the suggested violence was not imminent, but would potentially occur only at some point in the future after Dr. Means began offering abortion services. A threat of violence does not need to be imminent so long as it "convey[s] a gravity of purpose and likelihood of execution." *Crews*, 781 F.2d at 832. The district court concluded that a true threat must be imminent based mainly on language from a Second Circuit case which stated that "a district court must ask whether the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." *New York ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184, 196 (2d Cir. 2001) (internal quotation marks omitted). In recent cases, however, the Second Circuit has described this language as "dicta" and has rejected the argument that all threats must satisfy all of these conditions in order to fall outside of the First Amendment protections. *United States v. Turner*, 720 F.3d 411, 424 (2d Cir. 2013).

-11-

Imminence may contribute to a finding that a communication constitutes a true threat, but it is not a required element. *See id.* At the summary judgment stage, the pertinent question for the court to determine is simply whether a jury could reasonably find that "the statement itself [is] one that a reasonable person in the circumstances would understand as a declaration of intention, purpose, design, goal, or determination to inflict bodily injury on another." *United States v. Heineman*, 767 F.3d 970, 972 (10th Cir. 2014) (internal quotation marks and brackets omitted).

The district court also concluded that Defendant's letter could not be construed as a true threat because she only stated that an unidentified "someone" might place explosives under Dr. Means' car, not that she personally intended to commit an act of violence against Dr. Means. However, a direct statement of personal intent is not necessary for a jury to find that a communication conveys a threat of injury which will be "brought about—rather than merely predicted—by the defendant," *United States v. Cassel*, 408 F.3d 622, 636-37 (9th Cir. 2005). A jury may be more likely to find a true threat where a communication unequivocally and directly expresses the speaker's intent to personally commit an act of violence against the recipient, but it can still reasonably find a true threat even where the communication is more ambiguous. For instance, in *Viefhaus*, 168 F.3d at 394-96, we held that a reasonable jury could find a true threat where the defendant recorded a message stating that "a letter from a high ranking revolutionary commander has been written and received demanding that action be taken against the government by all white warriors by December 15th and if this action is not

-12-

taken, bombs will be activated in 15 pre-selected major U.S. cities." Likewise, in *United States v. Alaboud*, 347 F.3d 1293 (11th Cir. 2003), the Eleventh Circuit upheld a conviction where the defendant "never specifically asserted that he would personally carry out the promised vengeance" but left messages which "entailed graphic promises of violence that would fall upon" the victims, *id.* at 1297, such as "'one day soon one will come and liberate America and this planet from the grip of Jews, like yourself, . . . but the rest should be heads put in a vice,'" *id.* at 1295. *See also, e.g.*, *United States v. McMillan*, 53 F. Supp. 2d 895, 898 (S.D. Miss. 1999) (holding that the government had shown a violation of FACE where the defendant repeatedly shouted "where is a pipebomber when you need one" at an abortion doctor).

A defendant cannot escape potential liability simply by using the passive voice or couching a threat in terms of "someone" committing an act of violence, so long as a reasonable recipient could conclude, based on the language of the communication and the context in which it is delivered, that this was in fact a veiled threat of violence by the defendant or by someone acting under her direction or in conspiracy with her. As the Second Circuit has warned, "rigid adherence to the literal meaning of a communication without regard to its reasonable connotations . . . would render the statute powerless against the ingenuity of threateners who can instill in the victim's mind as clear an apprehension of impending injury by an implied menace as by a literal threat." *Turner*, 720 F.3d at 422 (internal quotation marks omitted).

Based on our de novo review of the record, we are persuaded a jury could

-13-

reasonably find Defendant's letter to convey a true threat of violence by her or someone acting in association with her. In determining whether a communication conveys a true threat, "context is critical . . . and history can give meaning to the [message]." *Planned Parenthood*, 290 F.3d at 1078. The context in this case includes Wichita's past history of violence against abortion providers, the culmination of this violence in Dr. Tiller's murder less than two years before Defendant mailed her letter, Defendant's publicized friendship with Dr. Tiller's killer, and her reported admiration of his convictions. When viewed in this context, the letter's reference to someone placing an explosive under Dr. Means' car may reasonably be taken as a serious and likely threat of injury, and Defendant's discussion of what Dr. Tiller might say if he "could speak from hell"—which inherently carries an implicit allusion to his death—can reasonably be read to provide an additional threatening undertone to the letter. We further conclude that a jury could reasonably find that an objective reader in Dr. Means' position would view the letter's description of "someone" placing an explosive under her car as a veiled threat that Defendant or a co-conspirator would carry out this act. Of course, the jury in this case might well agree with Defendant that her letter conveys, at most, a prediction of violence by third parties unknown to and unaffiliated with Defendant. However, the opposite conclusion is also reasonable, and this question must therefore be left for the jury to decide.

Defendant argues the government has "improperly attempt[ed] to 'link' [her] by innuendo with the Scott Roeder–George Tiller murder," suggesting that she is guilty by

association.  (Appellee's Br. at 39.)  She argues that "[i]t is inflammatory and impermissible to equate [Defendant] with Roeder."  (*Id.*)  She then cites to a Ninth Circuit case discussing the problem that "arises when the statements [at issue] not only fail to threaten violence by the defendants, but fail to mention future violence at all."  *Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 244 F.3d 1007, 1018 (9th Cir. 2001), *aff'd in part, vacated and remanded in part*, 290 F.3d 1058 (9th Cir. 2002).  In this situation, the Ninth Circuit held, context should not be stretched to read a violent intent into a statement that includes no mention of violence.  If the jury could find a non-violent statement to convey a threat of violence based simply on the violent actions of others, this "could have a highly chilling effect on public debate on any cause where somebody, somewhere has committed a violent act in connection with that cause."  *Id.*

However, the case before us does not involve a communication that "fail[ed] to mention future violence at all," *id.*, and the government is not arguing that a nonviolent statement should be infused with a violent meaning just because another abortion opponent has committed a violent act.  Rather, the government argues that a jury could reasonably find Defendant's own discussion of the possible bombing of Dr. Mean's car to convey a true threat of violence, coming as it did in the context of Wichita's violent past and Defendant's publicized friendship with, and comments about, the man who had murdered the last doctor to provide abortions in that city.  The government does not argue that Defendant must be guilty because she associated with Mr. Roeder; rather, the government contends that reports of her association with Mr. Roeder are part of the

-15-

context that would have an impact on a reasonable recipient's reaction to her letter.  In light of this context, a reasonable jury could find that the letter conveyed a true threat of violence.  The district court therefore erred in granting summary judgment in favor of Defendant on this ground.

Defendant argues we can affirm the district court's ruling on the alternative ground that the government has presented no evidence she subjectively intended to threaten Dr. Means.  The parties agree that FACE includes a subjective intent element:  a defendant is only liable if she "intentionally" injured, intimidated, or interfered by force or threat of force with someone seeking to obtain or provide reproductive health services.  18 U.S.C. § 248(a)(1).  Defendant contends she is entitled to summary judgment on this ground because the only evidence of her subjective intent is her own testimony and the statements she made to law enforcement officers and newspaper reporters that she does not approve of violence and had no intent to threaten Dr. Means or anyone else.

We find this argument unpersuasive.  "Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor.  For normally the actor is presumed to have intended the natural consequences of his deeds."  *Washington v. Davis*, 426 U.S. 229, 253 (1976) (Stevens, J., concurring); *see also Rankin v. Farmers Elevator Mut. Ins. Co.*, 393 F.2d 718, 720 (10th Cir. 1968) ("Persons are presumed to intend the natural and probable consequences of their acts.").  In this case, the government has presented evidence from which a jury could reasonably find that Defendant intentionally mailed Dr.

Means a letter which contains a threat of violence and therefore that she subjectively intended the natural consequence of this act—intimidating Dr. Means by a threat of force.

The government is not required to present any additional evidence of subjective intent to withstand summary judgment. Holding otherwise would significantly hamper the government's ability to prove a violation in any case involving a subjective intent element, since the government's evidence of subjective intent will often be limited to only the reasonable inferences that can be drawn from objective evidence of what actually occurred. Taking all of the evidence in the light most favorable to the government in this case, a jury could reasonably infer that Defendant intended to threaten Dr. Means when she intentionally sent her this letter. We accordingly conclude that Defendant is not entitled to summary judgment on this ground.

Finally, Defendant argues she is entitled to summary judgment on the additional alternative ground that the government's evidence fails to satisfy FACE's motive element. FACE is violated when an individual uses force or threats of force to injure, intimidate or interfere with someone "because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services." 18 U.S.C. § 248(a)(1). Defendant contends this motive element is only satisfied if the defendant was motivated by the actual or imminent provision of reproductive health services, not by the contemplated future provision of such services.

Defendant provides no support for this argument, and we have found none.

-17-

FACE's motive element is satisfied if the defendant uses threats "in order to intimidate [any] person . . . from . . . providing reproductive health services," *id.*, and nothing in the statute suggests it must be limited to current or imminent health services. The government has presented evidence from which a reasonable jury could find that Defendant wrote a letter to Dr. Means to do exactly what the text of the statute prohibits—intimidate her from providing abortion services. This satisfies the statutory motive requirement, and we accordingly deny Defendant's request to affirm the district court's summary judgment decision on this alternative ground.

A reasonable jury could find that Defendant's letter conveys a true threat, that she subjectively intended to threaten Dr. Means, and that she wrote to Dr. Means in order to intimidate her from providing reproductive health services. We therefore reverse the district court's grant of summary judgment in favor of Defendant and remand for further proceedings in accordance with this opinion.[2]

### III.

We turn now to Defendant's cross-appeal of the district court's denial of her motion to dismiss the action, reviewing the district court's decision de novo. *See Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999). Defendant

---

[2] We note that Defendant filed a separate motion for partial summary judgment on the government's request for a permanent injunction. The district court denied this motion as moot but stated "that in light of the evidence before it, [Defendant's] motion would appear to have substantial merit." (*Id.* at 368.) We agree with the district court's assessment of the merits of this motion. As it is no longer moot, the court on remand may wish to consider whether this motion should now be granted.

argues the action should have been dismissed because (1) the government lacked standing; (2) the First Amendment bars this action; (3) FACE violates the Commerce Clause both facially and as applied; and (4) the Religious Freedom Restoration Act prevents this application of FACE.

Defendant argues the district court should have dismissed the action for lack of standing because: (1) the government's standing to bring this complaint is derivative of Dr. Means' standing, if any; (2) Dr. Means was not an abortion provider at the time the letter was sent; and (3) the statute only provides standing to current abortion providers or doctors seeking to provide reproductive health services in a facility that already provides such services. This argument is fatally flawed because the government's standing to bring a complaint under FACE is not derivative of the victim's. FACE provides: "If the Attorney General of the United States has reasonable cause to believe that any person or group of persons is being, or has been, or may be injured by conduct constituting a violation of this section, the Attorney General may commence a civil action in any appropriate United States District Court." 18 U.S.C. § 248(c)(2)(A). Thus, the government has standing to bring a FACE enforcement action so long as it has reasonable cause to believe that someone "is, has been, or may be injured" by conduct proscribed by the statute. Contrary to Defendant's arguments, this standing is not dependent on whether the injured person could himself bring an action under § 248(c)(1). In this case, the government had reasonable cause to believe Dr. Means had been injured by conduct constituting a violation of FACE; thus, the district court correctly held that the

-19-

government had standing to bring this action. Because we affirm on this ground, we need not consider Defendant's other arguments relating to Dr. Mean's standing under the statute.

Second, Defendant argues the district court should have dismissed this case because it violates the First Amendment as applied. However, as the district court correctly held, the definition of a "threat" under FACE is coterminous with the definition of a "true threat" under the First Amendment; thus, Defendant will not be convicted of violating FACE unless her letter contained a threat that fell outside the First Amendment's protections. As explained above, we conclude that a reasonable jury could find that her letter contained such a threat. We therefore reject Defendant's First Amendment argument.

Next, Defendant argues that FACE violates the Commerce Clause both facially and as applied. Defendant concedes that she did not raise a Commerce Clause argument in the proceedings below, but she argues we should nevertheless consider these arguments on appeal because they implicate questions of our jurisdiction. She argues the government's authorization to bring this suit comes from FACE, so if FACE is an unconstitutional statute, the government lacked standing to file this action. She therefore contends we must resolve her constitutional challenges to FACE in order to determine whether the government had standing and thus whether we have jurisdiction over this case.

We do not find this argument persuasive. "Standing is determined as of the time

-20-

the action is brought," *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1154 (10th Cir. 2005), and the government had standing to bring this action under a statute which will be presumed constitutional unless and until the contrary is proven, *Heller v. Doe*, 509 U.S. 312, 320 (1993). We are not persuaded that a pending challenge to the constitutionality of a statute has a retroactive effect on the government's standing to initiate an action under this statute, and we accordingly conclude that Defendant's challenges to the constitutionality of FACE do not create an issue of Article III standing or otherwise give rise to a nonwaivable jurisdictional issue. We will therefore follow our general rule against considering arguments raised for the first time on appeal. *See MacArthur v. San Juan Cnty.*, 309 F.3d 1216, 1225 (10th Cir. 2002).

Finally, Defendant argues the district court should have dismissed this case under the Religious Freedom Restoration Act. As with Defendant's Commerce Clause arguments, this argument was not raised below, and we will not consider it for the first time on appeal.[3]

We accordingly affirm the district court's denial of Defendant's motion to dismiss.

## IV.

Before the court are two pending motions concerning whether to seal portions of

---

[3] In the proceedings below, Defendant argued the government violated her RFRA rights by seeking an injunction that would effectively prevent her from attending her church, which was located within 250 feet of Dr. Mean's office. However, she did not raise the argument she now seeks to raise on appeal—that RFRA bars any punishment based on her religious expression of her views about abortion to Dr. Means.

the appellate appendix and the parties' briefs on appeal. For the reasons discussed below, we direct the parties to re-file unsealed versions of the appendices with selected pages redacted. Moreover, we order that the parties' appellate briefing be unsealed.

The government filed two volumes of its appellate appendix under seal. The volumes contain documents sealed by the district court pursuant to two orders: a Privacy Act protective order (the Privacy Act Order) and an order designating certain documents as privileged (the Privilege Order). This court issued a sua sponte order to show cause why the volumes should remain sealed. In response to our order, the parties identified three distinct categories of documents they wish to maintain under seal. First, the government argues portions of Dr. Means' deposition testimony should remain under seal because they reference Dr. Means' personal medical history. Second, Defendant argues the documents originally sealed pursuant to the district court's Privacy Act Order should remain under seal. Third, Defendant asserts documents sealed under the Privilege Order fall within the clergy–penitent privilege and should remain under seal. We address each in turn.

"Courts have long recognized a common-law right of access to judicial records." *Mann v. Boatright*, 477 F.3d 1140, 1149 (10th Cir. 2007). "It is beyond question that this [c]ourt has discretionary power to control and seal, if necessary, records and files in its possession." *Crystal Grower's Corp. v. Dobbins*, 616 F.2d 458, 461 (10th Cir. 1980). "In exercising this discretion we weigh the interests of the public, which are presumptively paramount, against those advanced by the parties." *Id.* "The party seeking

-22-

to overcome the presumption of public access to the documents bears the burden of showing some significant interest that outweighs the presumption." *Helm v. Kansas*, 656 F.3d 1277, 1292 (10th Cir. 2011) (internal quotation marks omitted).

First, the government argues portions of Dr. Means's deposition should be subject to a protective order because they contain "highly personal and private medical information." (Appellant's Resp. to Order to Show Cause at 5.) We have previously recognized that the privacy interest inherent in personal medical information can overcome the presumption of public access. *See Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1135-36 (10th Cir. 2011) (approving the filing under seal of files containing private medical information); *see also Russell v. Lanier*, 404 F. App'x 288, 289 n.2 (10th Cir. 2010) (recognizing the "sensitive nature" of medical information and granting leave to file appendix under seal). Having reviewed the pages of Dr. Means's deposition identified by the government, we agree they contain the type of sensitive medical information that should remain under seal. Accordingly, pages 28–31, 117–18, 148–51, 226–27, 231–34, 237, 346, and 446 should be redacted upon refiling of the appendices.

Second, Defendant argues documents sealed pursuant to the district court's Privacy Act Order should remain under seal. (Appellee's Resp. to Order to Show Cause at 4.) The Privacy Act, 5 U.S.C. § 552a(b), provides that "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior

written consent of, the individual to whom the record pertains."  The government originally opposed disclosure of certain documents during discovery on the grounds that such disclosure would violate the Privacy Act.  (Privacy Act Order at 1.)  It now argues none of the documents contained in the sealed appendices fall within the protection of the Privacy Act, and it does not seek to maintain those documents under seal.  Defendant objects to unsealing the documents, arguing she "relied on" the Privacy Act Order "rather than seeking her own" protective order.  (Appellee's Resp. to Order to Show Cause at 3.)  But the only justification offered by Defendant is that disclosure would subject her to "private spite and public scandal."  (*Id.* at 4.) We have reviewed the portions of the appendices Defendant wishes to maintain under seal and concluded they do not contain the type of intensely personal information appropriate for filing under seal.

Finally, both parties agree that some documents should be maintained under seal because they fall within the clergy–penitent privilege.  (Appellee's Resp. to Order to Show Cause at 7-8; Appellant's Resp. to Order to Show Cause at 5.)  We have long recognized the significant interest parties have in maintaining privilege.  *Crystal Grower's*, 616 F.2d at 461.  We have also recognized a general public interest in maintaining robust protections for privileged communications.  *Id.*  We have reviewed the portions of the appendices identified by the parties as containing privileged information and agree they should remain under seal.  Accordingly, pages 86, 196, 206, 275, 299, 347–48, 359, 375–77, 381–83, and 440 should be redacted upon refiling.

We therefore direct the government to refile unsealed versions of the appendices, with the previously identified portions of Dr. Means' deposition testimony and clergy–penitent documents redacted.  As to the parties' briefing on appeal, Defendant has withdrawn her request to file the briefs under seal.  (*See generally* Appellee's Resp. to Appellant's Mot. to File Under Seal.)  Because the government moved to seal its brief only in response to Defendant's request, we order the parties to refile unsealed copies of their briefs within 10 days.

## V.

For the foregoing reasons, we **REVERSE** the district court's grant of summary judgment in favor of Defendant and remand for further proceedings.  The district court's denial of Defendant's motion to dismiss is **AFFIRMED**.  The parties are **ORDERED** to comply with our instructions regarding the briefs and appendix as detailed above.

*United States v. Dillard*, Nos. 13-3253 & 13-3266

**BALDOCK**, J., dissenting.

This is the third "true threat" case I have sat on during the past year.  *See also United States v. Wheeler*, 776 F.3d 736 (10th Cir. 2015); *United States v. Heineman*, 767 F.3d 970, 982–87 (10th Cir. 2014) (Baldock, J., concurring in the judgment).  And the decisions are not getting any easier—this thorny case being a perfect example.  Here, in contrast to my colleagues, I would affirm the district court because: (1) our case law, to my knowledge, has never been extended this far; and (2) the facts of this case do not merit such an extension.

The primary issue here is simple: Could a reasonable jury find that, objectively speaking, Angel Dillard threatened Dr. Mila Means?  The Court says yes.  The district court saw it differently, and so do I.  The key "threat" in Dillard's letter is her statement that, should Dr. Means ever follow through on her plan to provide abortions, Dr. Means "will be checking under your car everyday-because maybe today is the day someone places an explosive under it."  This statement was undeniably ill-advised.  But was it a true threat, rather than just an ugly prediction Dillard foolishly chose to voice?  *See United States v. Cassel*, 408 F.3d 622, 636–37 (9th Cir. 2005) ("Whether the threat is of injury to person or property, there is no doubt that it must be a threat of injury brought about—rather than merely predicted—by the defendant.").  The district court classified it as a prediction, in part because the statement was: (1) *conditional*, hinging on actions Dr. Means may or may not take in the future; (2) *not imminent*, as Dr. Means was years away from acting; and (3) *impersonal*, as Dillard never took ownership of the actions in this sentence (nor indeed, of the entire surrounding paragraph).  In response, the Court devotes a good portion of its

analysis to showing that a true threat can indeed be conditional, non-imminent, or impersonal. And I would agree. But here we are dealing with a letter that is *all of the above*: conditional, non-imminent, *and* impersonal. The Court does not acknowledge this complication, much less wrestle with it.

Any such wrestling should lead to this realization: Case law does not strongly support true threat exposure in a situation this attenuated. Certainly, none of our own cases cited by the Court provide a direct factual underpinning for this holding. In our most recent published decision, we allowed the case to go to a jury where the defendant, on Facebook, urged his "religious followers" to "kill [several named] cops. drown them in the blood of thier children, hunt them down and kill their entire bloodlines." *Wheeler*, 776 F.3d at 738. Later, he posted: "to my religious followers and religious operatives. if my dui charges are not dropped, commit a massacre in the stepping stones preschool and day care [near defendant's home], just walk in and kill everbody." *Id.* Finally, he posted that "in my faith revenge is the only commandment." *Id.* These posts were personal: Wheeler was calling for action, and not at all predicting the acts of an unrelated third party. Moreover, only the second post stated a condition (and therefore implied some level of delay); the first called for immediate mass murder with no strings whatsoever. In short, *Wheeler* bears little resemblance to our case. *See also Nielander v. Bd. of Cnty. Comm'rs*, 582 F.3d 1155, 1168–69 (10th Cir. 2009) (reasonable officer could believe true threat had been made where "agitated" man screamed he "would bring a gun *the next time* he went to a Commissioners' meeting" and if "they" attempted to collect taxes at his house it would provoke a "Ruby-Ridge-like incident").

Going back several decades does the Court no better. In *United States v. Crews*, we permitted a true threat prosecution where the defendant said if President Ronald "Reagan came to Sheridan, [Kansas,] I would shoot him" because it "would be in the best interest of this nation if that red-necked, bigoted, war-mongering mother fucker were shot." 781 F.2d 826, 829–30 (10th Cir. 1986). This threat was conditional and lacked immediacy, but (like *Wheeler*) it in no way could have been interpreted as an impersonal prediction; rather, it was a clear first-person threat. *See also United States v. Welch*, 745 F.2d 614, 616 (10th Cir. 1984) (upholding true threat conviction where man told mental health personnel that if President Reagan "was here, I would shoot him. I wouldn't make the same mistake as Hinckley did. I would kill him."). Thirteen years after *Crews*, we upheld a true threat conviction where the defendant stated in a publicly available message that unless "all white warriors" took action against the government within "one week from today," bombs would be "activated in 15 pre-selected major U.S. cities." *United States v. Viefhaus*, 168 F.3d 392, 394 (10th Cir. 1999). That immediacy (one week!) is a far cry from this case, and the context would require a reasonable listener to assume a personal connection between the defendant and the bombs. (How would the defendant know the number and location of the bombs, otherwise?)

The Court references cases from other circuits, as well. But these cases also plainly do not involve statements that were conditional, non-imminent, *and* impersonal. In *United States v. Turner*, for example, a defendant who was furious about a recent Seventh Circuit decision declared in a lengthy online post:

-3-

that the blood of these three judges would "replenish the tree of liberty," that the judges "didn't get the hint" sent by a gunman who had murdered the family of another federal judge in Chicago, that they had not "faced REAL free men willing to walk up to them and kill them for their defiance and disobedience," that their ruling was "so sleazy and cunning as to deserve the ultimate response," and that the judges "deserve to be killed." The next morning Turner posted photographs, work addresses, and room numbers for each of the three judges, along with a map indicating the location of the courthouse in which they worked, and a photograph of the building modified to point out "Anti-truck bomb barriers."

720 F.3d 411, 413–14 (2d Cir. 2013). This is coordination, not prediction. Nor is it conditional in the least, or futuristic. Turner threatened murder, and he wanted it done now.

Similar to *Turner* is *United States v. Schneider*, 910 F.2d 1569 (7th Cir. 1990). There, the defendant wrote to the Illinois Supreme Court: "I remind you again, that this 'Idiota Persona Non Grata' [a trial court judge] is of your problem and if [he] is allowed to continue to be mine, *he will be executed . . . .*" *Id.* at 1570 (emphasis added). Although phrased passively this is still plainly a first-person threat; the judge is giving *this* defendant problems, and if the judge is not stopped, execution awaits. Also distinguishable is *United States v. Alaboud*, where the defendant in a multitude of phone calls "generally promised retribution upon [his former attorney] Blake, [Blake's] law firm, the population of Florida and the Jewish people if [the defendant] was not refunded his retainer. . . . [For example, the defendant] told the firm's answering service that 'Ax and sledgehammers would be utilized to make justice." 347 F.3d 1293, 1295–96 (11th Cir. 2003). Needless to say, promising murderous retribution against your former attorney over a retainer is almost the definition of a personal threat.

One case from the Ninth Circuit deserves particular attention, because it also involved

abortion and FACE.  *See Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058 (9th Cir. 2002).  There, in a 6-5 *en banc* decision, the Ninth Circuit upheld a civil FACE action against a pro-life organization that had published, *inter alia*, "WANTED" posters listing abortion doctors and had crafted a "'Nuremberg Files' website displaying the names of abortion rights supporters with the names of those previously killed crossed out . . . ."  *Wheeler*, 776 F.3d at 744 (citing *Planned Parenthood*, 290 F.3d at 1075, 1080).  Past a superficial resemblance, however, differences abound between *Planned Parenthood* and this case.  To begin, publishing a "WANTED" poster to the world strongly implies, at minimum, that the publisher wants *immediate* and *unconditional* action—factors which are not present here.  In addition, the Ninth Circuit grounded its decision on "the previous *pattern* of 'WANTED' posters identifying a specific physician followed by that physician's murder."  *Planned Parenthood*, 290 F.3d at 1063 (emphasis added).  Thus, like the other cases listed above, it would be impossible to maintain with a straight face that the "WANTED" poster and "Nuremberg Files" website were mere predictions about the activities of others.  That is not the case here.

Indeed, the facts here more closely resemble *United States v. Lincoln*, where the Ninth Circuit held that a letter to President George W. Bush describing his upcoming assassination was *not* a true threat.  *See United States v. Lincoln*, 403 F.3d 703, 705 (9th Cir. 2005) (Statement: "You [President Bush] will see a good Job Done agin may 2 week's, maybe 2 months, 3, who know's.  *You Will Die too George W Bush real Soon* They Promised That you would Long Live *BIN LADEN*." (emphasis added)).  To distinguish *Planned*

*Parenthood*, the Ninth Circuit wrote the following, which essentially forecloses applying

*Planned Parenthood* against Dillard:

> Lincoln's letter differs from the "wanted" posters in *Planned Parenthood* because in that case there was a *clear pattern of appearance on a poster followed by murder.* It was this "poster pattern" that gave the otherwise innocuous posters their threatening portent. In this case, there is no pattern of letters written by Lincoln, followed by murder or any other act. There was only one letter written by Lincoln. Unlike the single letter in this case, the "wanted" posters were publicly posted on the internet, and thus could be reasonably interpreted as a signal to unknown third parties to target those who appeared on the posters. In contrast, *Lincoln's letter was to be sent only to President Bush.* In no way could the letter be reasonably viewed as a signal to Al Qaeda or anyone else to carry out an attack upon President Bush.

*Id.* at 707 (emphases added). Just like *Lincoln,* we have no murderous letter pattern or public

signaling here. Rather, we too have a single letter sent to a single recipient, containing a

description of potential future violence phrased impersonally.

Let us shift gears, though. I will readily concede that a case need not be on all fours

with a prior precedent before we can send it to the jury. After all, true threats can be found

in many shapes and sizes, and they must be analyzed based on the entire factual context of

a case. I will also concede there are likely situations where a jury could find that a

conditional, non-imminent, and impersonal statement was a disguised true threat. *Cf. United*

*States v. Local 30, United Slate, Tile & Composition Roofers, Damp & Waterproof Workers*

*Ass'n*, 686 F. Supp. 1139, 1149 (E.D. Pa. 1988) ("Daly *threatened* John Wanner . . . Daly

said: "Well, you better become union or something could happen to your truck. *It would be*

*a shame if something happened to your truck*." (emphases added)). With all this conceded,

I still am not convinced the Government has demonstrated *this* case to be such a scenario.

-6-

I begin with the letter itself. To be sure, Dillard did herself no favors with her acrimonious rhetoric. That said, the key statement—that "maybe today is the day someone places an explosive under [your car]"—is smack in the middle of a large, impersonal paragraph listing a dozen or so "consequences" that will occur if Dr. Means ever performs abortions. Crucially, a number of these events could not *possibly* be performed by Dillard or someone in her control. For example, Dillard concludes this list by emphasizing that Dr. Means' dreams "will be haunted by bloody, squirming, dismembered babies." Is Dillard objectively threatening to haunt Dr. Means in her sleep, à la Freddy Krueger, with visions of aborted children? Of course not. She is just predicting what she thinks Dr. Means' own brain may do to her, presumably trying to frighten her out of providing abortions. This is not illegal. *See, e.g.*, *New York ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184, 196 (2d Cir. 2001) ("[G]enerally, a person who informs someone that he or she is in danger from a third party has not made a threat, even if the statement produces fear."). But to hold as the Court does—that Dillard's car-bomb statement is a threat—logically implies that Dillard's "haunted" warning and other surrounding comments are also somehow threats. This seems to abuse the immediate context, rather than use it.

The broader context does not help the Court much, either. The Court relies heavily on the news article informing Dr. Means that Dillard associated with convicted murderer Scott Roeder. *See* Slip Op. at 15–16. (Indeed, the Court strongly implies that without Dr. Means being informed of this connection, Dillard's letter would not have qualified as a true threat.) This reliance is problematic on several levels. For starters, as the Court itself notes,

*the article is not in the record. See id.* at 5 n.1. For whatever reason, the Government has not provided it. So, with the pivotal contextual clue in this case nowhere to be found, the Court is forced to rely on Dr. Means' testimony *about* the article in order to send Dillard's case to a jury. *See id.* at 5 ("This article *apparently* reported that Defendant had befriended Mr. Roeder . . . ." (emphasis added)). This adds yet another (very uncomfortable) layer of doubt to these proceedings. In any event, even assuming the article said what it reportedly said, the Government's case is not improved to any great degree. This is because even Dr. Means admits the article stated Dillard and her husband had "*no plans to do anything of violence to anyone.*" *Id.* (emphasis added). As such, I believe the district court got it right:

> While Dr. Means learned from some reports that Dillard admired Roeder's convictions, the very same sources explain that Dillard has publicly deplored his violent actions. *There is nothing in the evidence before the court showing that Dillard ever supported Roeder's violent action.*

*United States v. Dillard*, 989 F. Supp. 2d 1169, 1175 (D. Kan. 2013) (emphasis added).

In its analysis, the Court does not mention Dillard's highly significant public disavowal of Roeder's violence. This seems to be a trend, rather than an aberration, as the Court glosses over a number of contextual clues that favor Dillard here. I will name just a few. First, the Court does not analyze the fact that neither the FBI nor the Wichita Police Department viewed Dillard's letter as a threat.[1] Law enforcement reaction alone may not be

---

[1] In its background section, the Court mentions that the "FBI did not take any of the follow-up actions they would have taken had they determined Defendant to be a threat." Slip. Op. at 5. The Court never brings this up in its analysis, however. The Wichita police report—which the Court does not mention at all, in background or analysis—stated that "there was not a direct threat against . . . Dr. Means." *Dillard*, 989

(continued...)

decisive, but it is highly indicative of what a reasonable person would believe. *See Fogel v. Collins*, 531 F.3d 824, 832 (9th Cir. 2008) ("The actions of the officers who actually saw the van and its message make clear that reasonable people would not have understood—and did not understand—the speech as a true threat."). The Court also omits from its analysis any discussion about Dillard's mailing the letter in an envelope bearing her own name and return address, which would hardly be prudent for someone intending to issue a legitimate threat. Nor does the Court acknowledge—in background or analysis—that Dr. Means openly admitted that "Dillard's warning letter is similar in content to what she had heard from family and friends." *Dillard*, 989 F. Supp. 2d at 1175. All this context, combined with the other concerns I raised above, leads me to disagree with the Court.

In the end, Dillard's crude rhetoric and the general preference for juries make this a tricky case. As I have demonstrated, though, the Court is on very shaky ground—in terms of precedent *and* factual context—when it sends this case to the jury. And shaky ground is not a desirable place to be, especially when a core First Amendment right is involved. As such, I cannot join the Court. *See Wheeler*, 776 F.3d at 742 (an "unusual set of facts" may preclude a true threat question from being sent to a jury). With all respect to my colleagues who see it differently, I dissent.[2]

---

[1](...continued)
F. Supp. 2d at 1172.

[2] Because I would affirm the district court, I would not reach the issues of subjective intent and statutory standing.