# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2020AP1775 |

| | |
|---|---|
| COMPLETE TITLE: | Nancy Kindschy,<br>   Petitioner-Respondent,<br>  v.<br>Brian Aish,<br>   Respondent-Appellant-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 401 Wis. 2d 406, 973 N.W.2d 828
(2022 – published)

| | |
|---|---|
| OPINION FILED: | June 27, 2024 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | December 1, 2022 and March 19, 2024 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|  COURT: | Circuit |
|  COUNTY: | Trempealeau |
|  JUDGE: | Rian W. Radtke |

JUSTICES:
DALLET, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, HAGEDORN, KAROFSKY, and PROTASIEWICZ, JJ., joined. REBECCA GRASSL BRADLEY, J., filed an opinion concurring in the judgment, in which ZIEGLER, C.J., joined.
NOT PARTICIPATING:

ATTORNEYS:

For the respondent-appellant-petitioner, there were briefs filed by *Dudley A. Williams,* and *Buting, Williams & Stilling S.C., Milwaukee;* Joan M. Mannix (pro hac vice), and *Thomas More Society, Chicago, IL*. There were oral arguments by *Joan M. Mannix.*

For the respondent-respondent, there were briefs filed by *Diane M. Welsh, Leslie A. Freehil* and *Pines Bach LLP, Madison.* There were oral arguments by *Leslie A. Freehil* and *Diane M. Welsh.*

An amicus curiae brief was filed by *Thomas C. Bellavia,* assistant attorney general, with whom on the brief was *Joshua L. Kaul,* attorney general, on behalf of Wisconsin Department of Justice.

An amicus curiae brief was filed by *Andrew t. Dufresne, Jacob A. Neeley,* and *Perkins Coie LLP, Madison; Arthur S. Greenspan (pro hac vice), Evelyn Pang (pro hac vice),* and *Perkins Coie LLP, New York, NY; Kathleen Wills (pro hac vice),* and *Perkins Coie LLP, Washington, D.C,* on behalf of End Domestic Abuse Wisconsin.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2020AP1775
(L.C. No. 2020CV40)

STATE OF WISCONSIN      :      IN SUPREME COURT

Nancy Kindschy,

       Petitioner-Respondent,

   v.

Brian Aish,

       Respondent-Appellant-Petitioner.

**FILED**

**JUN 27, 2024**

Samuel A. Christensen
Clerk of Supreme Court

---

DALLET, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, HAGEDORN, KAROFSKY, and PROTASIEWICZ, JJ., joined. REBECCA GRASSL BRADLEY, J., filed an opinion concurring in the judgment, in which ZIEGLER, C.J., joined.

---

REVIEW of a decision of the Court of Appeals. *Reversed and remanded.*

¶1 REBECCA FRANK DALLET, J. This case involves a harassment injunction issued against Brian Aish, an anti-abortion protestor, based on statements he made to Nancy Kindschy, a nurse practitioner, as she left her job at a family planning clinic. We must decide whether the injunction violates Aish's First Amendment right to free speech.

¶2 We conclude that the injunction is a content-based restriction on Aish's speech, and therefore complies with the First Amendment only if: (1) Aish's statements were "true threats" and he "consciously disregarded a substantial risk that his [statements] would be viewed as threatening violence;" or (2) the injunction satisfies strict scrutiny; that is, it is narrowly tailored to achieve a compelling state interest. See Counterman v. Colorado, 600 U.S. 66, 69 (2023); R.A.V. v. City of St. Paul, 505 U.S. 377, 395 (1992). On the record before us, we hold that the injunction fails to satisfy either of these two standards. We therefore reverse the decision of the court of appeals and remand to the circuit court with instructions to vacate the injunction.[1]

I

¶3 Brian Aish protests outside of family planning clinics to "warn women [seeking abortions] they will be accountable to God on the day of judgment if they proceed," and to persuade clinic staff to work elsewhere. Between 2014 and 2019, Aish regularly protested at two clinics where Nancy Kindschy worked as a nurse practitioner. Aish's conduct during that time consisted mainly of holding up signs quoting Bible verses and

---

[1] Our remedy, directing the circuit court to vacate the injunction, is limited to the injunction at issue in this case, and does not affect any injunction issued in any other case. On remand, the circuit court need not dismiss the petition and is free to conduct additional fact-finding to consider whether an injunction premised on new facts complies with the First Amendment.

preaching his Christian and anti-abortion beliefs broadly to all staff and visitors. Beginning in 2019, however, Aish began directing his comments toward Kindschy, singling her out with what she believed to be threatening messages.

¶4 Kindschy petitioned for a harassment injunction under Wis. Stat. § 813.125 (2019-20).[2] That statute allows the court to issue an injunction if there are "reasonable grounds to believe that the respondent has engaged in harassment with intent to harass or intimidate the petitioner." § 813.125(4)(a)3. Harassment is defined in pertinent part as "[e]ngaging in a course of conduct or repeatedly committing acts which harass or intimidate another person and which serve no legitimate purpose." § 813.125(1)(am)4.b.

¶5 The circuit court[3] heard two days of testimony, and made the following findings of fact:

- On October 8, 2019, as Kindschy and a co-worker were leaving the clinic, Aish stated that Kindschy had time to repent, that "it won't be long before bad things will happen to you and your family," and that "you could get killed by a drunk driver tonight."

- On February 18, 2020, Aish said to Kindschy, "I pray you guys make it home safely for another day or two

---

[2] All subsequent references to the Wisconsin Statutes are to the 2019-20 version.

[3] The Honorable Rian W. Radtke of the Trempeleau County Circuit Court presided.

until you turn to Christ and repent. You still have time."

- On February 25, 2020, Aish again indicated that Kindschy would be lucky if she made it home safely.

- The statements made by Aish on these dates were specifically directed toward Kindschy.

¶6 The circuit court further found that the testimony of both Kindschy and Aish was credible. Kindschy, the circuit court explained, was credible and genuine, although "her recollection wasn't exactly clear on certain details." And Aish was "very credible as to what happened [during] the incidents, as well as his position on his religious beliefs." As the circuit court explained, Aish was "trying to share the gospel, and also has a stance of being against the things that Planned Parenthood does, which includes abortions . . . ." According to the circuit court, Aish's purpose in speaking to Kindschy was "to get [her] to leave her employment or stop what she was doing," but also, "a dual purpose here was to get Ms. Kindschy to adopt . . . Mr. Aish's religious beliefs . . . ." The circuit court said that persuading another person to adopt different religious beliefs was "a legitimate purpose from [Aish's] perspective, from his standpoint," and noted that Aish's statements were made in the context of "convey[ing] a message of repentance" and were "even coming from a place of love or nonaggression." Nonetheless, the circuit court found that Aish's statements were intimidating because they were the "types of things [that] certainly would intimidate somebody

4

because . . . they are statements that address somebody's loss of life or their family members being hurt or harmed . . . ." The circuit court further concluded that Aish's statements did not serve a legitimate purpose because "to use intimidation or scare tactics" to persuade someone to leave their employment or adopt different religious beliefs is "not a legitimate purpose."

¶7 Following the hearing, the circuit court issued a four-year injunction which prohibited Aish from speaking to Kindschy, or going to her residence "or any other premises temporarily occupied by [Kindschy]." Aish appealed and the court of appeals affirmed the issuance of the injunction. See Kindschy v. Aish, 2022 WI App 17, 401 Wis. 2d 406, 973 N.W.2d 828.

¶8 We granted review. After we heard oral argument but before we issued an opinion, the United States Supreme Court decided Counterman v. Colorado, 600 U.S. 66 (2023), holding that in a criminal prosecution for harassment premised on true threats, the First Amendment requires the government to prove at a minimum that the defendant "consciously disregarded a substantial risk that his communications would be viewed as threatening violence." Id. at 69. Subsequently, we ordered the parties to submit supplemental briefing and heard a second round of oral argument regarding the impact of Counterman on this case.

II

¶9 When reviewing a harassment injunction, we uphold the

5

circuit court's factual findings unless they are clearly erroneous. See Bd. of Regents-UW Sys. v. Decker, 2014 WI 68, ¶20, 355 Wis. 2d 800, 850 N.W.2d 112. We review whether a harassment injunction complies with the First Amendment de novo. See id.

III

¶10 The First Amendment protects the fundamental right to free speech. See U.S. Const. amend. I ("Congress shall make no law . . . abridging the freedom of speech"). "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." Ashcroft v. ACLU, 535 U.S. 564, 573 (2002) (internal quotation marks omitted).

¶11 But this principle is not absolute. Regulation of speech based on the message it conveys, known as a content-based restriction, may pass constitutional muster in two ways. First, if the regulation restricts speech that falls into one of several historically unprotected categories, such as "fighting words,"[4] incitement to imminent lawless action,[5] obscenity,[6] defamation,[7] or——as is relevant here——"true threats." Watts v. United States, 394 U.S. 705 (1969) (per curiam). Second, if the regulation restricts otherwise protected speech but satisfies strict scrutiny; that is, if it is "'necessary to serve a compelling state interest and . . . [are] narrowly drawn to achieve that end.'" State v. Baron, 2009 WI 58, ¶45, 318 Wis. 2d 60, 769 N.W.2d 34 (quoting Boos v. Barry, 485 U.S. 312, 321 (1988)).

---

[4] Chaplinsky v. New Hampshire, 315 U.S. 568 (1942).

[5] Brandenburg v. Ohio, 395 U.S. 444 (1969) (per curiam).

[6] Miller v. California, 413 U.S. 15 (1973).

[7] New York Times Co. v. Sullivan, 376 U.S. 254 (1964).

¶12 The harassment injunction in this case is a content-based restriction. That is because it was issued based on the content of Aish's speech, namely his statements that "bad things are going to start happening to [Kindschy] and [her] family," she "could get killed by a drunk driver tonight," and that she "would be lucky if [she] got home safely."[8] See City of Austin v. Reagan Nat'l Advert. of Austin, LLC, 596 U.S. 61, 69 (2022) ("A regulation of speech is facially content based under the First Amendment if it 'target[s] speech based on its communicative content'——that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" (quoting Reed v. Town of Gilbert, 576 U.S. 155, 163 (2015))). Kindschy primarily argues that the injunction is nonetheless constitutional because Aish's statements were true threats and were thus unprotected by the First Amendment. Kindschy's secondary argument is that even if Aish's statements were not true threats, the injunction is constitutional because it survives strict scrutiny.

¶13 We begin by evaluating Kindschy's true-threats argument. We conclude that even if Aish's statements were true threats——an issue we do not decide——the harassment injunction still violates the First Amendment because the circuit court did not make the necessary finding that Aish "consciously disregarded a substantial risk that his communications would be viewed as threatening violence." Counterman, 600 U.S. at 69. We then explain why the injunction cannot be upheld on alternate grounds because it does not satisfy strict scrutiny.

A

---

[8] Kindschy contends that the injunction entered against Aish is content neutral because it does not prevent him from expressing certain ideas or opinions as long as they aren't directed towards Kindschy. Kindschy misunderstands the analysis. Restrictions on speech are content neutral if they "are justified without reference to the content of the regulated speech." See Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989). Here, the injunction is not content neutral because it was justified based on the content of Aish's speech.

¶14 "True threats are 'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence.'" Id. at 74 (quoting Virginia v. Black, 538 U.S. 343, 359 (2003)). In Counterman v. Colorado, the United States Supreme Court explained that "a statement can count as [a true] threat based solely on its objective content." Id. at 72. Thus, "[t]he existence of a [true] threat depends not on 'the mental state of the author,' but on 'what the statement conveys' to the person on the other end." Id. at 74 (quoting Elonis v. United States, 575 U.S. 723, 733 (2015)).[9] In other words, determining whether a statement is a true threat does not require an inquiry into the speaker's subjective mindset.

¶15 Although the test for whether a statement is a true threat is objective, Counterman held that before a person may be criminally convicted for making a true threat, the First Amendment requires proof of the speaker's subjective intent. See id. at 69. Specifically, the Court determined that in order to avoid chilling protected, non-threatening expression, proof that the speaker acted at least recklessly is required. See id.

---

[9] Prior to Counterman, we followed a different standard for determining whether a statement was a true threat. In State v. Perkins, 2001 WI 46, ¶29, 243 Wis. 2d 141, 626 N.W.2d 762, we held that "[a] true threat is a statement that a speaker would reasonably foresee that a listener would reasonably interpret as a serious expression of a purpose to inflict harm[.]" This analysis, which considers the perspectives of both the listener and the speaker, is inconsistent with the objective test for true threats stated by the United States Supreme Court in Counterman. Accordingly, Counterman abrogated Perkins on this ground, and Counterman's test for true threats is binding.

8

at 78-79. Recklessness in this context means that the speaker "consciously disregarded a substantial risk that his communications would be viewed as threatening violence." Id. at 79.

1

¶16 Kindschy claims that because she sought a civil harassment injunction against Aish, Counterman's requirement that the government prove a defendant's subjective mental state does not apply. In support, Kindschy makes two arguments. First, she contends that Counterman did not explicitly extend its holding beyond the criminal prosecution at issue in that case. Second, Kindschy asserts that unlike the Colorado statute at issue in Counterman, the intent-to-harass requirement in Wis. Stat. § 813.125 always satisfies Counterman's recklessness standard.

¶17 We find neither of Kindschy's arguments persuasive.[10] To begin with, nothing on the face of the Court's decision limits its holding to the criminal context.[11] On the contrary,

_____

[10] Some courts have, with little or no analysis, declined to apply Counterman in the civil context. See Sealed Plaintiff 1 v. Patriot Front, No. 22-cv-670, 2024 WL 1395477, at *29 (E.D. Va. Mar. 31, 2024); Boquist v. Courtney, 682 F. Supp. 3d 957, 969 n.10 (D. Or. July 17, 2023). These courts summarily dismissed Counterman's relevance because no criminal statute was at issue in the case. But as we explain, although Counterman involved a criminal prosecution, nothing in the Court's analysis suggests its holding is limited to the criminal context.

[11] The language the Supreme Court used to describe liability strengthens this point. The Court repeatedly used the word "liability" by itself, not "criminal liability" or "criminal punishment." See, e.g., Counterman, 600 U.S. at 75, 79 n.5.

two aspects of the decision indicate that it also applies to a civil harassment injunction premised on true threats. First, the Court relied upon the law of defamation and incitement, which includes both civil and criminal liability. The Court emphasized that the recklessness rule it was adopting "fits with the analysis in [the Court's] defamation decisions," which also "adopted a recklessness rule, applicable in both civil and criminal contexts[.]" Counterman, 600 U.S. at 80 (emphasis added). And the Court explained that the more stringent intent standard required in civil and criminal incitement cases "compel[led] the use of a [recklessness] standard" in true threats cases. Id. at 82. By relying on these civil claims, the Supreme Court implied that the same standard for criminal prosecutions also applies to civil harassment injunctions based on true threats.

¶18 Second, the Court's broader reasoning is as applicable to civil harassment injunctions based on true threats as it is to criminal prosecutions. The Court's animating concern in Counterman was that applying an objective standard to true-threat claims might chill otherwise protected speech. See id. at 75. As the Court said, "A speaker may be unsure about the side of a line on which his speech falls. Or he may worry that the legal system will err, and count speech that is permissible as instead not. Or he may simply be concerned about the expense of becoming entangled in the legal system." Id. Those concerns are just as salient in the context of a civil harassment injunction as they are in the criminal context. Although the

stakes may be higher in a criminal prosecution, the threat of a civil harassment injunction may be no less chilling of protected speech.

¶19 As to her second argument, Kindschy points to the requirement in § 813.125 that the circuit court find the respondent "engaged in harassment with intent to harass or intimidate the petitioner." § 813.125(4)(a)3. (emphasis added). A finding of intent to harass or intimidate, she argues, will always satisfy Counterman's recklessness standard because intent is a higher bar than recklessness.

¶20 This argument conflates two distinct findings: the finding that the speaker intended to harass or intimidate under § 813.125 and the finding that the speaker intentionally or recklessly uttered a true threat under the First Amendment. We have previously interpreted what it means to "harass" or "intimidate" under § 813.125, and neither is synonymous with a true threat. To harass under the statute is to "worry and impede by repeated attacks, to vex, trouble or annoy continually or chronically, to plague, bedevil or badger." Bachowski v. Salamone, 139 Wis. 2d 397, 407, 407 N.W.2d 533 (1987) (citation omitted). To intimidate under the statute is to "'make timid or fearful.'" Id. (quoted source omitted). In contrast, a true threat under the First Amendment is an expression "conveying that a speaker means to 'commit an act of unlawful violence.'" Counterman, 600 U.S. at 74 (quoting Black, 538 U.S. at 359). Because the terms have distinct meanings, meeting the standard for one does not implicate the standard for the other. In other

11

words, a court can find one intended to harass or intimidate another without necessarily finding someone uttered a true threat at all, let alone uttered one intentionally or recklessly. For that reason, the intent standard in § 813.125 cannot serve as a substitute for Counterman's recklessness standard.

¶21 In sum, we hold that Counterman applies to civil harassment injunctions premised on true threats. Thus, before issuing such an injunction, a circuit court must find that the respondent "consciously disregarded a substantial risk that his communications would be viewed as threatening violence." Id. at 69.

2

¶22 In this case, the circuit court's harassment injunction was issued before Counterman was decided. The circuit court therefore did not evaluate whether Aish's statements were true threats, or whether he "consciously disregarded a substantial risk that his communications would be viewed as threatening violence." Id. Because the circuit court failed to make clear findings regarding Aish's subjective mental state as it relates to his statements to Kindschy, we need not decide whether Aish's statements were true threats. Whether they were true threats or not, the injunction cannot be justified on true-threats grounds. See id.

B

¶23 Kindschy alternatively argues that the injunction against Aish is nonetheless constitutional because it survives

strict scrutiny. As mentioned previously, content-based restrictions on protected speech are constitutionally permissible if they are "necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end." Baron, 318 Wis. 2d 60, ¶45. Kindschy claims several state interests are served by the injunction, including protecting her right to privacy, her right to free passage in going to and from work, and her right to be free from the fear of death or bodily harm. See Hill v. Colorado, 530 U.S. 703, 716-717 (2000); Black, 538 U.S. at 360. She further maintains that the injunction is narrowly tailored and burdens no more speech than is necessary because Aish is free to protest anywhere except locations she temporarily occupies.

¶24 Strict scrutiny is a high bar, and the injunction at issue here cannot clear it. Even if the interests Kindschy identified are compelling, an injunction still must be narrowly tailored to protect those interests. Baron, 318 Wis. 2d 60, ¶45. Here, the injunction orders Aish to avoid any location Kindschy might be, effectively prohibiting Aish from speaking not just to Kindschy, but to others at the clinic or anywhere else that she might be. In doing so, the injunction burdens significantly more speech than is necessary to protect individual privacy, freedom of movement to and from work, and freedom from fear of death. Therefore, it cannot survive strict scrutiny.

III

13

¶25 We conclude that Counterman applies to civil harassment injunctions premised on true threats. Even if Aish's speech fell into this unprotected category of speech, the circuit court did not find that he "consciously disregarded a substantial risk that his communications would be viewed as threatening violence." Counterman, 600 U.S. at 69. Therefore, we conclude that the injunction is not permissible on this basis. Additionally, we determine the injunction is a content-based restriction on Aish's speech and that it fails to satisfy strict scrutiny because it is not narrowly tailored to protect a compelling state interest. Accordingly, we conclude that the injunction violates the First Amendment, and remand to the circuit court with instructions to vacate the injunction.

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶26 REBECCA GRASSL BRADLEY, J. *(concurring in the judgment).*

> [I]f Men are to be precluded from offering their sentiments on a matter, which may involve the most serious and alarming consequences, that can invite the consideration of Mankind; reason is of no use to us——the freedom of Speech may be taken away——and, dumb & silent we may be led, like sheep, to the Slaughter.

From George Washington to Officers of the Army, 15 March 1783.[1]

¶27 Brian Aish protested regularly at a Planned Parenthood clinic in Blair, Wisconsin. On multiple occasions, Aish made statements directed at a Planned Parenthood employee, Nancy Kindschy, as she left the Planned Parenthood facility. Based on those statements, the circuit court ordered Aish to avoid places temporarily occupied by Kindschy, effectively enjoining Aish from protesting at the Blair Planned Parenthood facility for four years. Aish contends the injunction violates the First Amendment. It does.

¶28 For the injunction to clear the First Amendment, the majority holds it must either proscribe a true threat or the injunction must survive strict scrutiny. The majority does not decide whether Aish's comments were true threats; instead, it holds the injunction violates the First Amendment because the circuit court did not make the required mens rea finding under Counterman v. Colorado, 600 U.S. 66 (2023), and the injunction fails strict scrutiny. I agree. But the injunction against Aish violates the First Amendment——and therefore must be

---

[1] https://founders.archives.gov/documents/Washington/99-01-02-10840.

1

vacated——for a more fundamental reason: The circuit court never deemed Aish's statements true threats, and no reasonable factfinder could have made such a finding based on the record before the circuit court.

I

¶29 Kindschy worked as a nurse practitioner at the Planned Parenthood facility in Blair, Wisconsin.[2] The facility was open only on Tuesdays from 9:00 a.m. to 5:00 p.m. Aish protested at the facility nearly every Tuesday, between 12:00 p.m. and closing time. Aish would share his religious views and his views on Planned Parenthood and abortion with those entering and leaving the facility.

¶30 On March 10, 2020, Kindschy petitioned for a harassment injunction against Aish under Wis. Stat. § 813.125. To grant an injunction under § 813.125, a circuit court must conclude "reasonable grounds [exist] to believe that the respondent has engaged in harassment with intent to harass or intimidate the petitioner." § 813.125(4)(a)3. The statute defines "harassment," as relevant in this case, as "[e]ngaging in a course of conduct or repeatedly committing acts which harass or intimidate another person and which serve no legitimate purpose."[3] § 813.125(1)(am)4.b. The circuit court held hearings on July 13 and September 9, 2020.

_____

[2] Kindschy has since retired, according to her counsel.

[3] "Harassment" is statutorily defined to also include "[s]triking, shoving, kicking or otherwise subjecting another person to physical contact; engaging in an act that would constitute abuse under s. 48.02 (1), sexual assault under s. 940.225, or stalking under s. 940.32; or attempting or

2

¶31 Kindschy testified that on October 8, 2019, as she left the Blair Planned Parenthood facility, Aish stood on the sidewalk three to four feet away from her vehicle holding a sign. Aish looked at Kindschy and said, "You have time to repent. You will be lucky if you don't get killed by a drunk driver on your way home. Bad things are going to start happening to you and your family." According to Kindschy, Aish was "very aggressive," "loud," and "very stern" during this interaction. She testified his statements made her fearful. According to Kindschy, Aish had never before made comments about her possibly being killed or bad things happening to her family.

¶32 Kindschy testified that on October 15, 2019, as she left the clinic, Aish received a ticket from a police officer.[4] Aish told her she has blood on her hands. According to Kindschy, Aish was "cold, angry, and loud." Kindschy also testified that on October 29, 2019, as she drove out of the facility's parking area, Aish walked from the sidewalk onto the road and waived an anti-abortion sign close to her vehicle.

¶33 The next relevant interaction between Kindschy and Aish occurred on February 18, 2020. Kindschy testified Aish stood on the sidewalk a few feet from her vehicle and said, "Ma'am, you have time to repent. If I recall, you are Lutheran." He told her she has blood on her hands, called her a liar, and asked, "Do you know who plays the game of lies, ma'am?

threatening to do the same." Wis. Stat. § 813.125(1)(am)4.a.

[4] Kindschy's testimony does not explain why Aish received a ticket.

3

It's [S]atan. Satan will come to judge you." He also said she would be "lucky if [she] got home safely and that [she] could possibly be killed and that bad things are going to start happening to [her] family." According to Kindschy, she felt threatened by these words. Aish made the comments to her directly, and according to Kindschy, he was "very loud, very stern, and he was very agitated."

¶34 Kindschy recorded this interaction, and the recording was submitted into evidence during the hearing. The recording shows Aish was not loud, stern, or agitated. He stood on the sidewalk, several feet away from Kindschy. He held a sign that said, "Those who love me, obey me! Jesus." Aish said to Kindschy, "You play the game of the lies ma'am. You know who the father of all lies is?" He also remarked, "You're a professing Christian. If I remember right, you are Lutheran aren't you?" He then stated, "You understand the father of all lies is Satan, not God. You mock but he'll be mocking on the day of your judgment." As Kindschy entered the front driver's side of her vehicle, Aish can be heard saying, "I'll pray you guys make it home safely for another day or two so you turn to Christ and repent. You still have time." Kindschy testified the recording reflected how Aish behaved during all relevant interactions.

¶35 The final encounter occurred a few days after the recorded interaction, on February 25, 2020. Kindschy testified Aish said she lied about him to the authorities, she still has time to repent, and she would "be lucky if [she is] able to make

4

it home safely." She testified she felt threatened by being called a liar. Aish was "very loud," "very stern," and "very agitated." Kindschy acknowledged Aish never touched her or her vehicle and remained on the sidewalk during the relevant encounters.

¶36 Although Aish directed specific comments at Kindschy, she testified Aish made what Kindschy characterized as harassing comments to other staff and patients. For example, Aish told the building's security guard, "they're training you to be a death court, they're training you to have a hardened heart." To a new medical assistant, he said, "They're training you to have a hardened heart; that's Planned Parenthood's way." Aish told patients the clinic condones abortion and Planned Parenthood is a "murder mill."[5]

---

[5] Two center managers for Planned Parenthood also testified. Shonda Racine confirmed that on October 8, 2019, Aish told Kindschy she has "blood on [her] hands" and "[b]ad things are going to start happening to you and your family; you need to repent; I cannot help you." Racine said she thought these statements were threats. She testified that on October 15, 2019, Aish told Kindschy she has "blood on [her] hands." On October 29, 2019, Aish again said to Kindschy, "You need to repent, you have blood on your hands." Racine testified that on each one of these dates, Aish was "aggressive," "[l]oud," and "angry." He was "yelling and screaming." According to Racine, Aish never touched her or Kindschy. Racine also testified Aish would protest throughout the day when he was at the Blair Planned Parenthood facility, sharing his position with those around him. Racine also watched the video of the February 18, 2020, incident. According to her, Aish was louder during the October, 2019 incidents she witnessed.

¶37 Aish also testified. He described his Christian beliefs and explained the purpose of his protests was to "share the gospel with young women murdering their children." He explained he would go to the Blair Planned Parenthood facility, among other places, to "share the gospel" and "warn those going in there that if they're going to even consider torturing and murdering their child for convenience or choice, they're being misled and they're going to be accountable because they're shedding innocent blood of a child . . . ." By "held accountable," Aish meant by God. He testified he would stay until the Blair Planned Parenthood facility closed to try to convince the last patients not to be "misled" and to share his religious views with them. "I want them to turn away from their sin and because 7,000 people are dying every day in this country, we don't know if we're going to have another day . . . so we try to warn them because they may not make it to next week, with DUI accidents, murder or criminal behavior and all of that."

¶38 Aish denied targeting Kindschy in particular, but said he has known her longer than any of the other employees. He shared his message with nearly everyone. Aish expressed that his protests came from a place of "love." "We're there because we're trying to warn them and trying to get them to repent and

---

Jess Beranek testified Aish directed his comments to Kindschy on February 18, 2020. Beranek also testified Kindschy appeared bothered and scared after the incident. According to Beranek, Aish became more aggressive after the location became a Planned Parenthood facility. It is unclear from the record on what date Planned Parenthood began operating the facility.

6

turn away from their sinful lifestyle, especially doing something so heinous as being involved with Planned Parenthood." Aish stated he had no intention of harming Kindschy. Telling Kindschy she could be killed by a drunk driver was, according to Aish, part of his religious message: "I'm warning them because 7,000 people die in this country every day and most of them do not know the gospel and we don't know if we'll have a tomorrow. So God warns us, don't assume you're going to have a tomorrow, worry about today."

¶39 While the circuit court found all of the witnesses credible, it noted Kindschy sometimes blurred days together and sometimes "wasn't exactly clear on certain details." Aish, according to the circuit court, was "very credible as to what happened on the incidents, as well as his positions on his religious beliefs."

¶40 Ultimately, the circuit court issued an injunction against Aish. The court based the injunction on statements made by Aish on three occasions, which the court found were directed at Kindschy specifically: (1) October 8, 2019 ("You have time to repent. You will be lucky if you don't get killed by a drunk driver on your way home. Bad things are going to start happening to you and your family."); (2) February 18, 2020 ("I'll pray you guys make it home safely for another day or two so you turn to Christ and repent. You still have time."); and (3) February 25, 2020 (Kindschy would "be lucky if [she is] able to make it home safely."). The circuit court found that Aish was not angry or aggressive while making these statements;

7

rather, based on the video footage of the February 18, 2020, incident, the court found Aish was merely "passionate about his beliefs." Nevertheless, the circuit court said such comments would be intimidating "even in the context that is presented here of trying to convey a message of repentance." Although Aish was "trying to share the gospel" and change the behavior of those working at Planned Parenthood, coming from a "place of love or nonaggression," the circuit court found Aish's statements "would intimidate somebody" because the statements "address somebody's loss of life."

¶41 The circuit court also determined Aish's conduct served no legitimate purpose. The court found Aish wanted to "scare" Kindschy into leaving Planned Parenthood's employ and adopting his religious beliefs. According to the court, Aish's "scare tactics" were not a legitimate method to achieve his goals. Although the court noted the importance of Aish's First Amendment right to protest, the circuit court ultimately determined Kindschy should not "have to even think about that she might get killed on her way home or bad things are going to happen to her and her family." The circuit court ordered Aish to cease harassing Kindschy; to avoid her residence or any premises temporarily occupied by her; and to avoid all communication with her.

## II

¶42 Freedom of speech is a principal pillar of a free government; when this support is taken away, the constitution of a free society is dissolved, and tyranny is erected on its ruins.

8

Benjamin Franklin, On Freedom of Speech and the Press, Pa. Gazette, Nov. 1737, reprinted in 2 The Works of Benjamin Franklin 285, 285 (Boston, Hilliard, Gray & Co. 1840).

¶43 The First Amendment reads, in relevant part, "Congress shall make no law . . . abridging the freedom of speech."[6] U.S. Const. amend. I. With few exceptions, the state may not prohibit or restrict speech based on its content. "The hallmark of the protection of free speech is to allow 'free trade in ideas'——even ideas that the overwhelming majority of people might find distasteful or discomforting." Virginia v. Black, 538 U.S. 343, 358 (2003) (quoting Abrams v. United States, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)). "Content-based regulations [of speech] are presumptively invalid" under the First Amendment. R.A.V. v. City of St. Paul, 505 U.S. 377, 382 (1992). Only "well-defined" and "narrowly limited" categories of speech fall beyond the historical protections of the First Amendment. Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72 (1942); R.A.V., 505 U.S. at 382-83. "These 'historic and traditional categories long familiar to the bar,'" United States v. Stevens, 559 U.S. 460, 468 (2010) (quoting Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd., 502 U.S. 105, 127 (1991) (Kennedy, J., concurring in the judgment)), include "true threats." Black, 538 U.S. at 359-60; Watts v. United States, 394 U.S. 705, 707-08 (1969) (per curiam).

---

[6] The United States Supreme Court has held that the Fourteenth Amendment incorporates the First Amendment against the states. Gitlow v. New York, 268 U.S. 652 (1925).

¶44 Not all statements that stoke fear in listeners are true threats. "True threats are 'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence.'" Counterman, 600 U.S. at 74 (alteration in original) (quoting Black, 538 U.S. at 359). Threats must be "real" for the government to proscribe them. Elonis v. United States, 575 U.S. 723, 747 (2015) (Alito, J., concurring in part and dissenting in part); State v. Perkins, 2001 WI 46, ¶17, 243 Wis. 2d 141, 626 N.W.2d 762 ("[S]ome threatening words are protected speech under the First Amendment."). True threats——as distinguished from protected expressions——"convey a real possibility that violence will follow." Counterman, 600 U.S. at 74 (citing Watts, 394 U.S. at 708).

¶45 To constitute a true threat, the communication must express, explicitly or implicitly, that the speaker or a co-conspirator intends to inflict imminent or future injury on the victim. Id.; New York ex rel. Spitzer v. Operation Rescue Nat'l, 273 F.3d 184, 196 (2d Cir. 2001); United States v. White, 670 F.3d 498, 513-14 (4th Cir. 2012); Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists, 290 F.3d 1058, 1076 (9th Cir. 2002) (en banc); United States v. Cassel, 408 F.3d 622, 636-37 (9th Cir. 2005); United States v. Bagdasarian, 652 F.3d 1113, 1119 (9th Cir. 2011); United States v. Viefhaus, 168 F.3d 392, 396 (10th Cir. 1999); United States v. Wheeler, 776 F.3d 736, 746 (10th Cir. 2015); United States v. Dillard, 795 F.3d 1191, 1201 (10th Cir. 2015). This element is essential. Speech cannot be punished or restricted on the

10

ground that a listener "fears a generalized harm because of what the speaker has suggested." Matthew G. T. Martin, True Threats, Militant Activists, and the First Amendment, 82 N.C. L. Rev. 280, 315 (2003). If the communication does not convey the speaker or a co-conspirator will enact violence on the victim, "then understanding the communication as a threat is 'objectively less reasonable' and the perceptions and fears of the listener are devoid of a sufficiently rational basis." Id. at 316 (footnotes omitted).

¶46 Violence must be threatened, not "merely predicted," hoped for, or endorsed. Cassel, 408 F.3d at 636-37; Bagdasarian, 652 F.3d at 1119; United States v. Lincoln, 403 F.3d 703, 707 (9th Cir. 2005); State v. Carroll, 196 A.3d 106, 119 (N.J. Super. Ct. App. Div. 2018). The standard for assessing a communication is an objective one; a statement is a true threat only if a reasonable listener,[7] who is familiar with the full context, would understand the statement as conveying the speaker or a co-conspirator intends to inflict unlawful violence on a person or group of people. See, e.g., Counterman, 600 U.S. at 74 (quoting Elonis, 575 U.S. at 733) ("The existence of a threat depends . . . on 'what the statement conveys' to the

---

[7] "The listener might be the victim of a threat or another recipient of the communication." State v. Perkins, 2001 WI 46, ¶25 n.15, 243 Wis. 2d 141, 626 N.W.2d 762. Reasonable listeners are not "omniscient persons, aware of every fact potentially existing at the time of the speech. The . . . 'reasonable listener' [is] limited in knowledge to the facts readily available to the . . . actual listener at the time of the speech at issue." State v. Douglas D., 2001 WI 47, ¶34 n.12, 243 Wis. 2d 204, 626 N.W.2d 725.

11

person on the other end."). "The speaker need not actually intend to carry out the threat," Black, 538 U.S. at 359-60; nor is it "necessary that the speaker have the ability to carry out the threat."[8] Perkins, 243 Wis. 2d 141, ¶29.

¶47 True threats are not protected by the First Amendment for a host of reasons: The fear such threats inflict on individuals and society,[9] the "disruption that fear engenders," and the possibility of preventing violence that may follow a threat. R.A.V., 505 U.S. at 388; see also Rogers v. United States, 422 U.S. 35, 47 (1975) (Marshall, J., concurring) ("Like a threat to blow up a building, a serious threat on the President's life is enormously disruptive and involves substantial costs to the Government."). Threats of violence can paralyze the victims of crime from taking action. As Justice Samuel Alito has noted, "[t]hreats of violence and intimidation are among the most favored weapons of domestic abusers . . . ." Elonis, 575 U.S. at 748 (Alito, J., concurring in part and dissenting in part); see Wittig v. Hoffart, 2005 WI App 198, 287 Wis. 2d 353, 704 N.W.2d 415.

---

[8] A speaker's known inability to carry out the alleged threat may make it less reasonable to believe the statement is a serious expression of intent to enact violence. See State v. Krijger, 97 A.3d 946, 960 n.11 (Conn. 2014).

[9] Jennifer E. Rothman, Freedom of Speech and True Threats, 25 Harv. J.L. & Pub. Pol'y 283, 291 (2001) ("The psychological fear created by a threat to oneself or one's family or the threat of serious property damage . . . is unquestionably a disturbing experience. People who are forced to live under the shadow of such threats suffer a myriad of psychological and health problems including nightmares, heart problems, inability to work, loss of appetite, and insomnia.").

12

¶48 Threats of violence undermine one of the central values animating the First Amendment: deliberative democratic decision making. Self-government requires a robust, uninhibited exchange of viewpoints. See Terminiello v. City of Chicago, 337 U.S. 1, 4 (1949). Threats of violence "silence the speech of others who become afraid to speak out," Counterman, 600 U.S. at 89 (Sotomayor, J., concurring in part and concurring in the judgment), rendering the "market place of ideas,"[10] upon which our democracy relies, less populous. State v. Taylor, 866 S.E.2d 740, ¶67 (N.C. 2021) (Earls, J., concurring in part, dissenting in part) (quoted source omitted) (alteration in original) ("If the cost of participating in public life is to be bombarded with serious threats of violence towards one's self and family, many people will choose to forego contributing their voices to the 'free exchange [that] facilitates an informed public opinion, which, when transmitted to lawmakers, helps produce laws that reflect the People's will.'"); Planned Parenthood, 290 F.3d at 1086 (noting true threats "turn[] the First Amendment on its head" by shutting the victims of threats out of public debate through fear). "[A] society which is forced to settle political disputes in the looming shadow of violence . . . cannot function as a self-governing democracy." Taylor, 866 S.E.2d 740, ¶69 (Earls, J., concurring in part, dissenting in part).

---

[10] United States v. Rumely, 345 U.S. 41, 56 (1953) (Douglas, J., concurring); Abrams v. United States, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting) ("free trade in ideas").

13

¶49 At the same time, "First Amendment vigilance is especially important when speech is disturbing, frightening, or painful, because the undesirability of such speech will place a heavy thumb in favor of silencing it" whether the First Amendment protects such speech or not. Counterman, 600 U.S. at 87 (Sotomayor, J., concurring in part and concurring in the judgment). Political speech is often caustic, heated, and outrageous, tempting would-be censors to recast political speech as threats of violence. See Operation Rescue, 273 F.3d at 195-96 ("As much as we might idealize the antiseptic, rational exchange of views, expressions of anger, outrage or indignation nonetheless play an indispensable role in the dynamic public exchange safeguarded by the First Amendment."); Martin, supra, at 296 (noting "much effective political rhetoric, as well as philosophical, religious, and motivational rhetoric, is meant to engender fear as a means to promote a paradigm shift").

¶50 The First Amendment is a bulwark against the weaponization of the justice system to squelch or even criminalize disfavored political voices. Courts are duty bound to protect the free exchange of thought on which our republic depends. At the same time, courts ought not "lend a cloak of legitimacy to methods of achieving political change that are antithetical to everything the First Amendment stands for." Taylor, 866 S.E.2d 740, ¶70 (Earls, J., concurring in part, dissenting in part).

III

14

¶51 Whether a statement constitutes a true threat beyond the protection of the First Amendment is a question of fact usually left for the factfinder to decide, unless a statement is "unquestionably" protected by the First Amendment, such that no reasonable factfinder could find the statement is a true threat. See State v. Douglas D., 2001 WI 47, ¶33, 243 Wis. 2d 204, 626 N.W.2d 725; accord Perkins, 243 Wis. 2d 141, ¶48; Watts, 394 U.S. at 708; United States v. Clemens, 738 F.3d 1, 13 (1st Cir. 2013); United States v. Malik, 16 F.3d 45, 51 (2d Cir. 1994) (citing United States v. Carrier, 672 F.2d 300, 306 (2d Cir. 1982)); United States v. Stock, 728 F.3d 287, 298 (3d Cir. 2013); United States v. Landham, 251 F.3d 1072, 1083 (6th Cir. 2001); United States v. Parr, 545 F.3d 491, 497 (7th Cir. 2008); Brandy v. City of St. Louis, 75 F.4th 908, 915 (8th Cir. 2023); United States v. Merrill, 746 F.2d 458, 462-63 (9th Cir. 1984); Wheeler, 776 F.3d at 742.[11] The factfinder must consider the totality of the circumstances and "all relevant factors that might affect how the statement could reasonably be interpreted." Perkins, 243 Wis. 2d 141, ¶¶29, 31. In this case, as the majority notes, majority op., ¶22, the circuit court did not consider whether Aish's statements were true threats and made no findings on that issue.[12] Given the findings already made by the

---

[11] But see United States v. Bly, 510 F.3d 453, 457-58 (4th Cir. 2007) (citing Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 506-11 (1984)) ("Whether a written communication contains either constitutionally protected 'political hyperbole' or an unprotected 'true threat' is a question of law and fact that we review de novo.").

[12] The lack of circuit court findings regarding true threats suffices to vacate the circuit court's injunction, and this

15

circuit court after an evidentiary hearing, no reasonable factfinder could find Aish's statements were true threats.[13]

IV

¶52 A true threats analysis begins with an examination of the statements themselves. See State v. Krijger, 97 A.3d 946, 958 (Conn. 2014). Aish made three statements to Kindschy on which the circuit court based the injunction:

- October 8, 2019: "You have time to repent. You will be lucky if you don't get killed by a drunk driver on your way home. Bad things are going to start happening to you and your family."

- February 18, 2020: "I'll pray you guys make it home safely for another day or two so you turn to Christ and repent. You still have time."

---

court could have done so at least a year ago. Successive rounds of supplemental briefing and oral argument ordered by the majority were unnecessary to decide this case, and the delay only prolonged the impermissible restraint on Aish's liberty. See Kindschy v. Aish, No. 2020AP1775, unpublished order (Wis. July 28, 2023) (Rebecca Grassl Bradley, J., dissenting); Kindschy v. Aish, No. 2020AP1775, unpublished order (Wis. Feb. 5, 2024) (Rebecca Grassl Bradley, J., dissenting).

[13] "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Wis. Stat. § 805.17(2). "A circuit court's findings of fact are clearly erroneous when the finding is against the great weight and clear preponderance of the evidence. Under the clearly erroneous standard, 'even though the evidence would permit a contrary finding, findings of fact will be affirmed on appeal as long as the evidence would permit a reasonable person to make the same finding.'" Royster-Clark, Inc. v. Olsen's Mill, Inc., 2006 WI 46, ¶12, 290 Wis. 2d 264, 714 N.W.2d 530 (internal citations and quoted source omitted); Phelps v. Physicians Ins. Co. of Wis., 2009 WI 74, ¶39, 319 Wis. 2d 1, 768 N.W.2d 615.

- February 25, 2020: Aish said that Kindschy lied about him to the authorities, she still has time to repent, and she would "be lucky if [she is] able to make it home safely."

On their face, Aish's statements cannot be interpreted as true threats.

¶53 Aish uttered words of caution or warnings, not threats of violence. The statement, "Bad things are going to start happening to you and your family," does not overtly refer to violence. "Bad things" could include violence, but they could just as easily include other undesirable outcomes, such as the loss of a job.

¶54 More importantly, none of the three statements suggested Aish or a co-conspirator would be the one to cause any harm to Kindschy. At most, the statements suggested unaffiliated third parties could cause Kindschy harm, like a "drunk driver." When Aish specified what kind of harm might befall Kindschy, it was a harm he would be extremely unlikely to cause and not something he would intend. If a statement does not expressly or implicitly suggest the speaker or co-conspirator intends to commit the violence, the statement cannot be viewed as a true threat. "[T]he statement, 'If you smoke cigarettes you will die of lung cancer,' is protected, even though its purpose is to scare you into quitting smoking. So is, 'If you mess around with Tom's girlfriend, he'll break your legs,' unless the speaker is sent by Tom." Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists, 244

17

F.3d 1007, 1015 n.8 (9th Cir. 2001), aff'd in part, vacated and remanded in part, 290 F.3d 1058. People who believe employees of abortion providers "are sinners who are going to be struck down by the hand of God should be able to voice their beliefs. The line is crossed, however, when the speaker suggests that he or his associates will help God by taking action down on Earth." Jennifer E. Rothman, Freedom of Speech and True Threats, 25 Harv. J.L. & Pub. Pol'y 283, 346 (2001). On their face, Aish's statements did not cross that line.

¶55 Aish's statements could not be true threats of violence because he disclaimed any desire for violence to befall Kindschy. Lincoln, 403 F.3d at 707 (holding a letter could not be a true threat because the author "disassociated himself from any violent action"); In re R.D., 464 P.3d 717, ¶53 (Colo. 2020) (A true threats inquiry "should [] examine whether the speaker said or did anything to undermine the credibility of the [alleged] threat."); cf. Krijger, 97 A.3d at 961 (speaker apologizing immediately after saying the listener would get into a car accident, just as his son did years earlier, undercut the threatening undertone of the statement). For example, Aish said he would "pray" Kindschy made it home safely so that she could "turn to Christ and repent." Aish thereby expressed he did not want Kindschy to get hurt. Instead, he hoped she would adopt his religious views and leave her job at Planned Parenthood. In other statements, Aish again implored Kindschy to "repent" and only then suggested a car accident could occur. If the harm Aish predicted happened to Kindschy, she could not repent;

18

Kindschy's repentance, not harm to her, was Aish's stated objective. None of Aish's statements conveyed an intent to enact violence on Kindschy.

¶56 A true threat analysis does not end with what a statement means on its face, however. As with all other forms of communication, context is everything. See Perkins, 243 Wis. 2d 141, ¶¶29, 31; Douglas D., 243 Wis. 2d 204, ¶¶38-39. The Sixth Circuit explained:

> A reasonable listener understands that a gangster growling "I'd like to sew your mouth shut" to a recalcitrant debtor carries a different connotation from the impression left when a candidate uses those same words during a political debate. And a reasonable listener knows that the words "I'll tear your head off" mean something different when uttered by a professional football player from when uttered by a serial killer.

United States v. Jeffries, 692 F.3d 473, 480 (6th Cir. 2012). A true threat may "blossom[]" or wither away when context is considered. Lincoln, 403 F.3d at 704; In re S.W., 45 A.3d 151, 156 (D.C. 2012) ("A threat is more than language in a vacuum. It is not always reasonable—and sometimes it is patently irrational—to take every pronouncement at face value."); Fogel v. Collins, 531 F.3d 824, 832 (9th Cir. 2008) (speech may not be a true threat in context even if "taken literally"). A burning cross placed on one's lawn does not literally say, "I am going to kill you." But given the grotesque history of cross burning in the United States, the message is unmistakable to the recipient. See generally, Black, 538 U.S. 343.

¶57 An expression that in one context may be a warning could be a veiled threat of violence in another—"you better

19

watch your back," for example. State v. Taveras, 271 A.3d 123, 131 (Conn. 2022). Context is how we distinguish warnings from veiled threats. "You've got to give him the money or he'll kill you" is likely a warning if coming from one's wife, and a threat if coming from a henchman. Given the relevant context, Aish's statements can only be understood as warnings to Kindschy that she needed to repent before harm befell her. From Aish's point of view, Kindschy engaged in sinful conduct, and should repent and cease such conduct or risk God's condemnation. Some might be disturbed by Aish's comments, but they were not true threats.

¶58 The environment in which speech is uttered and the events leading up to a statement are valid contextual considerations in any true threats inquiry. Jeffries, 692 F.3d at 482; State v. Carroll, 196 A.3d. at 117. In this case, Aish's comments were made in the context of his ongoing and religiously inspired protests at the Blair Planned Parenthood facility. The testimony shows Aish visited the grounds outside the facility regularly to protest Planned Parenthood and abortion, and he shared his religious message with nearly everyone. Although true threats can, of course, be made at protests, when statements are made as a part of an ongoing protest, a reasonable listener is more likely to see the statement as charged political or religious rhetoric, not a sincere threat of violence. See Watts, 394 U.S. at 708. In this case, Aish's protests took place on the sidewalk outside of the Planned Parenthood facility——the traditional forum for sharing ideas. See Frisby v. Schultz, 487 U.S. 474, 480 (1988)

20

(quoted source omitted) (alteration in original) ("'[T]ime out of mind' public streets and sidewalks have been used for public assembly and debate . . . .").

¶59 The meaning of a statement can change depending on the tone and demeanor of the speaker. State v. A.S., 2001 WI 48, ¶24, 243 Wis. 2d 173, 626 N.W.2d 712; United States v. Alaboud, 347 F.3d 1293, 1297 (11th Cir. 2003); United States v. Ivers, 967 F.3d 709, 719 (8th Cir. 2020). "I'm going to kill you" said with a smile and laugh is unlikely a true threat; in contrast, "I'm going to kill you" said in angry, aggressive, or rage-filled tones, is more likely to be a true threat. Kindschy contends Aish was loud, angry, and aggressive when he made his statements. The recording that captured the events of February 18, 2020, belies her account. The recording reveals Aish was not loud, angry, or aggressive; he spoke with a normal tone and demeanor. Indeed, the circuit court found that Aish was not angry or aggressive during their interactions, but "passionate about his beliefs." Based on this record, it is far more reasonable to understand Aish's statements as warnings grounded in his religious beliefs rather than veiled threats.

¶60 The nature and specificity of the alleged threats are also relevant factors. Alaboud, 347 F.3d at 1297. Aish's statements were somewhat vague. He indicated "[b]ad things" would begin to happen to Kindschy and her family if she didn't repent. He also suggested she could get into a car accident, perhaps caused by a drunk driver. These statements lacked "accurate details tending to heighten" the reasonable belief the

21

speaker will act on his statements. R.D., 464 P.3d 717, ¶53; Bailey v. Iles, 87 F.4th 275, 285 (5th Cir. 2023) (social media post held not to be a true threat, in part, because it failed to "threaten[] [a] specific harm at [a] specific location[]"); United States v. Turner, 720 F.3d 411, 421 n.5 (2d Cir. 2013) (distinguishing "obviously flippant statement[s]" from "lengthy and detailed discussion[s]" of harm). The statements did not suggest Aish planned to harm Kindschy or "considered acting on these supposed threats." Taylor, 866 S.E.2d 740, ¶82 (Earls, J., concurring in part, dissenting in part); see Ivers, 967 F.3d at 717 ("'You don't know the 50 different ways I planned to kill her.'").

¶61 In assessing whether a statement is a sincere warning or a veiled threat, courts consider whether the listener had reason to believe the speaker had a propensity to engage in violence. Perkins, 243 Wis. 2d 141, ¶31 (quoting United States v. Hart, 212 F.3d 1067, 1071 (8th Cir. 2000)); S.W., 45 A.3d at 158-60. For example, in Wittig v. Hoffart, the court of appeals held a speaker's threats to kill his wife could reasonably be viewed as true threats, as opposed to "empty posturing, devoid of any venal intent," because of his prior pattern of abusing the victim. 287 Wis. 2d 353, ¶¶18-20. The past abuse included yelling at her, shaking her head, pushing her down and dragging her, suffocating her with a pillow, touching her sexually in an inappropriate manner, and putting his hands around her neck and squeezing. Id., ¶¶2-4. In short, because he "'made good on his

22

threats in the past,'" it made sense to take his threats to kill her seriously. Id., ¶3.

¶62 Nothing in the record suggests a listener would believe Aish had a propensity for violence. Nothing in the record suggests Aish threatened to harm Kindschy or anyone else in the past. See Douglas D., 243 Wis. 2d 204, ¶37; United States v. Dinwiddie, 76 F.3d 913, 917-18 (8th Cir. 1996). Nor does the record indicate Aish committed any violent acts against anyone——ever. See Dinwiddie, 76 F.3d at 917-18, 925. Kindschy testified Aish never touched her or her vehicle at any point; he remained on the sidewalk, several feet away from her, during each of the three encounters. The record is bereft of any evidence Aish took steps to carry out a plan to harm others. Parr, 545 F.3d at 501 ("[W]hen a person says he plans to blow up a building, he will naturally be taken more seriously if he has a history of building bombs and supporting terrorism.") The record lacks any evidence Aish endorsed or advocated for violence against employees of abortion providers or associated with anyone who did. Id.; Dinwiddie, 76 F.3d at 918 (speaker was "a well-known advocate of the viewpoint that it is appropriate to use lethal force to prevent a doctor from performing abortions"); Dillard, 795 F.3d at 1201-02 (speaker had a publicized friendship with someone who recently killed the location's only abortion provider). In short, none of Aish's past actions or background suggests he is or was apt to enact violence on Kindschy.

¶63 Kindschy argues Aish's comments are reasonably understood as veiled threats in light of historical and ongoing violence perpetrated against abortion providers. But Kindschy has never explained why Aish's statements should be viewed as threats in light this violence. While it is true a veiled threat may exist when "a speaker makes a statement against a known background of targeted violence," Thunder Studios, Inc. v. Kazal, 13 F.4th 736, 746 (9th Cir. 2021), unlike other cases involving abortion providers, none of Aish's comments alluded to, or were concomitant with, any real-world acts of violence. Cf. A.S., 243 Wis. 2d 173, ¶23 (student's statements that he would kill everyone at his school could be true threats because the student made allusions to a similar, real-world event, familiar to himself and others at the school: the Columbine High School shooting).

¶64 In United States v. Hart, the defendant parked two Ryder trucks close to the doors of an abortion clinic, blocking the entrances. 212 F.3d at 1072. He left each truck unattended and without indicating their purpose. Id. at 1069. On its own, this was not a true threat. Only two years earlier, however, a federal office building had been bombed, and the crime involved a Ryder truck. Id. at 1070. Given the Ryder trucks' history and placement at the entrances of the facility, the employees of the facility, unsurprisingly, worried their building would be bombed too. Unlike the trucks in Hart, Aish's statements did not allude to any recent, or well-known, real-world acts of intentional violence.

24

¶65 In <u>United States v. Dillard</u>, a family practitioner, Dr. Mila Means, publicly confirmed she would offer abortion services to the public in Wichita. 795 F.3d at 1196. At the time, no doctors were performing abortions in Wichita; the last doctor to do so (Dr. George Tiller) was murdered two years prior. <u>Id.</u> In a letter to Dr. Means, Angela Dillard wrote, "If Tiller could speak from hell, he would tell you what a soulless existence you are purposefully considering . . . ." <u>Id.</u> Dillard added, "You will be checking under your car everyday——because maybe today is the day someone places an explosive under it." <u>Id.</u> "I urge you to think very carefully about the choices you are making. . . . We will not let this abomination continue without doing everything we can to stop it." <u>Id.</u> at 1197. Dillard also had a publicized friendship with Dr. Tiller's killer. <u>Id.</u> at 1202. As the Tenth Circuit explained:

> The context in this case includes Wichita's past history of violence against abortion providers, the culmination of this violence in Dr. Tiller's murder less than two years before Defendant mailed her letter, Defendant's publicized friendship with Dr. Tiller's killer, and her reported admiration of his convictions. When viewed in this context, the letter's reference to someone placing an explosive under Dr. Means' car may reasonably be taken as a serious and likely threat of injury, and Defendant's discussion of what Dr. Tiller might say if he "could speak from hell"——which inherently carries an implicit allusion to his death——can reasonably be read to provide an additional threatening undertone to the letter.

25

Id. at 1201.[14] No similar contextual factors exist in this case. Nothing in the record documents any history of violence at the Blair Planned Parenthood facility. Aish's statements did not allude to past acts of intentional violence against abortion providers. There is no evidence Aish endorsed or associated with anyone who has engaged in violent activism.

¶66 Courts must be careful not to use the context of background violence by third parties to misconstrue obviously non-threatening speech as true threats. Doing so would impermissibly chill the speech of those who express a position shared by a violent fringe. The "fear of liability due to third party action would deprive the marketplace of particular ideas and particular speakers of the liberty to express such ideas." Martin, supra, at 306.

¶67 The conditional nature of Aish's statements is not very probative. Conditional statements are sometimes less threatening than non-conditional statements. See Watts, 394 U.S. at 706-08 ("'If they ever make me carry a rifle the first man I want to get in my sights is L.B.J.'"). Aish suggested bad things, including death, could happen if Kindschy did not repent. While warnings are generally conditional ("If you don't buckle your seatbelt, you may die in a car crash"), so are most threats. United States v. Schneider, 910 F.2d 1569, 1570 (7th Cir. 1990) (citing United States v. Velasquez, 772 F.2d 1348,

---

[14] See also United States v. Dinwiddie, 76 F.3d 913, 917 (8th Cir. 1996); Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coal. of Life Activists, 290 F.3d 1058, 1085 (9th Cir. 2002) (en banc).

1357 (7th Cir. 1985)) ("Most threats are conditional; they are designed to accomplish something; the threatener hopes that they <u>will</u> accomplish it, so that he won't have to carry out the threats."). Because the conditional nature of Aish's statements could cut either way, that factor cannot be dispositive in this case.

¶68 The listener's reaction is not very probative either. Although Kindschy testified she felt threatened by Aish's statements, such testimony is not dispositive.[15] See <u>Douglas D.</u>, 243 Wis. 2d 204, ¶37 (holding a creative writing assignment describing the teacher having her head cut off by a student, which the teacher believed was a threat, was not a true threat under the First Amendment); <u>Wheeler</u>, 776 F.3d at 746 (listener's reaction is "not dispositive"). The test for whether a statement constitutes a true threat is objective, not subjective. We consider whether a reasonable listener, given relevant context, would understand Aish's statements as threats

---

[15] Kindschy did not pursue her claim of harassment under Wis. Stat. § 813.125(1)(am)4.a., which defines "harassment" as "[s]triking, shoving, kicking or otherwise subjecting another person to physical contact . . . or attempting or threatening to do the same." As counsel for Kindschy conceded before the circuit court, that definition is "not relevant" in this case.

27

of violence.[16]  Elonis, 575 U.S. at 751 (Thomas, J., dissenting) (explaining the reasonable listener test ensures speech will not "be suppressed at the will of an eggshell observer"); Operation Rescue, 273 F.3d at 196 ("[E]xcessive reliance on the reaction of recipients would endanger First Amendment values, in large part by potentially misconstruing the ultimate source of the fear.").  On its own, a listener's reaction cannot convert non-threatening statements into true threats.  See R.D., 464 P.3d 717, ¶61.

¶69  In some cases, directing a statement to a particular person might suggest the statement is a threat.  See Hart, 212 F.3d at 1071.  Although Aish's statements were made directly to Kindschy, a reasonable listener would not believe Aish intended to inflict violence on Kindschy.  A clearly non-threatening statement, such as a word of caution or warning, does not become threating merely because it is directed to a particular person. An indirect warning is often ineffective.

V

¶70 A law that can be directed against speech found offensive to some portion of the public can be turned against minority and dissenting views to the detriment

---

[16] Importantly, the record does not indicate Kindschy ever reported Aish's statements to the police as threats of violence. See United States v. Bagdasarian, 652 F.3d 1113, 1121 (9th Cir. 2011); New York ex rel. Spitzer v. Operation Rescue Nat'l, 273 F.3d 184, 196 n.5. (2d Cir. 2001).  Nothing in the record shows how police officers reacted to his statements.  It is also unclear what Kindschy meant when she testified she felt threatened by Aish.  During her testimony, she said she felt threatened by Aish on February 25, 2020, because he called her a liar.  Calling someone a liar does not convey an intent to enact violence.

of all. The First Amendment does not entrust that power to the government's benevolence. Instead, our reliance must be on the substantial safeguards of free and open discussion in a democratic society.

Matal v. Tam, 582 U.S. 218, 253–54 (2017) (Kennedy, J., concurring in part and concurring in the judgment).

¶71 The government may not silence speech simply because it offends or frightens others. The circuit court entered an injunction against Aish because it believed Kindschy should not "have to even think about that she might get killed on her way home or bad things are going to happen to her and her family." The First Amendment, however, protects speech that makes people think about the possibility of their deaths. Unless a reasonable listener, who is familiar with the full context, would understand the statement as conveying the speaker or a co-conspirator intends to inflict unlawful violence on a person or group of people, the speech cannot be restricted or punished.

¶72 Some might regard Aish's speech as frightening, offensive, and hurtful. But silencing speech because it offends "strikes at the heart of the First amendment." Id. at 246 (plurality opinion). "'If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.'" Snyder v. Phelps, 562 U.S. 443, 458 (2011) (quoting Texas v. Johnson, 491 U.S. 397, 414 (1989)). "[T]he proudest boast of our free speech jurisprudence is that we protect the freedom to express 'the thought that we hate.'" Matal, 528 U.S. at 246 (quoting United States v. Schwimmer, 279 U.S. 644, 655 (1929) (Holmes, J.,

29

dissenting)). Before the People ratified the Constitution, our Founders understood that infringing the essential liberty to speak freely would imperil our freedom.

¶73 Free speech rights bear a cost. They force us to endure distressing and loathsome speech. See, e.g., Snyder, 562 U.S. at 454 (holding the First Amendment protected the picketing of a funeral with signs that included messages such as "Thank God for IEDs," "God Hates Fags," and "Thank God for Dead Soldiers"); Bible Believers v. Wayne Cnty., 805 F.3d 228, 238 (6th Cir. 2015) (en banc) (protesters carrying signs saying, inter alia, "Islam Is A Religion of Blood and Murder" along with "a severed pig's head on a spike"). That is the price we pay for living in a free society that tolerates and encourages, rather than suppresses, alternative points of view. Free speech stands as a bulwark against tyranny.

¶74 Because a reasonable factfinder could not construe Aish's statements as true threats, the First Amendment protects them. An unconstitutional injunction impermissibly infringed Aish's fundamental First Amendment right to speak freely on "a profound moral issue on which Americans hold sharply conflicting views." Dobbs v. Jackson Women's Health Org., 597 U.S. 215, 223 (2022). The government violated Aish's free speech rights for nearly four years, in part because of this court's avoidable delay in deciding the matter. Any future attempt to enjoin Aish based on those statements would violate the Constitution.

¶75 I am authorized to state that Chief Justice ANNETTE KINGSLAND ZIEGLER joins this concurrence.

30